### PRESSED STEEL CAR CO. v. UNION PAC. R. CO.

(District Court, S. D. New York. December 17, 1918.)

1. PATENTS ⬅️212(1)—LICENSES—EFFECT.

Where plaintiff, the owner of a patent for railroad cars, entered into an agreement with a railroad company providing that it might manufacture cars covered by the patent on payment of a certain royalty per car, or cause them to be built, held, that the railroad company was not required to pay royalty on cars bought from another company, which had a nonexclusive license to make and sell cars embodying the invention.

2. DAMAGES ⬅️40(2)—PROFITS—SPECULATIVE PROFITS.

Where a contract between plaintiff, the owner of a patent, and a railroad company, which gave the latter the right to build cars covered by the patent, provided that plaintiff should have a preference over other car builders for the construction of cars covered by the patent, held that, on the railroad company's breach of the preference agreement, plaintiff could not recover damages, for the profits which plaintiff might have made are wholly speculative.

At Law. Action by the Pressed Steel Car Company against the Union Pacific Railroad Company. Judgment in part for plaintiff, but denying in part the recovery sought.

See, also, 241 Fed. 964.

The parties entered into a contract, the essential features of which are as follows:

"Agreement made the 1st day of November, 1905, between Pressed Steel Car Company, a corporation * * * (hereinafter called the Car Company), of the first part, and Union Pacific Railroad Company, a corporation * * * (hereinafter called the Railroad Company), of the second part;

"Whereas, the Car Company is the owner of certain patents covering various devices or designs used by the Railroad Company in the construction of 'common standard' freight cars; * * * and

"Whereas, the Railroad Company admits the use by it in the construction of its 'common standard' freight cars of certain designs and patented devices owned by the Car Company, * * * and admits the validity of the patents embodied therein, and has agreed not to evade or attempt to evade said patented devices * * * as embodied in its 'common standard' freight cars; and

"Whereas, the Railroad Company is desirous of making an arrangement with the Car Company whereby it may build or cause to be built, under royalty, freight cars containing such designs and patented devices for its own use and the use of the various railroad companies now or hereafter owned or controlled by it by the ownership of a majority of the capital stock herein or otherwise, or leased or operated by it, but not for sale; and

"Whereas, the Railroad Company has since the 1st of June, 1904, built and caused to be built 'common standard' freight cars in which the devices covered by said patents of the Car Company have been used:

"Now, therefore, * * * it is agreed as follows between the parties hereto:

"First. From the date of the execution of this agreement until the 21st day of December, 1914, the Railroad Company shall have a right and license to construct or have constructed for its own use and the use of the various railroad companies now or hereafter owned or controlled by it by the ownership of a majority of the capital stock therein or otherwise, or leased or operated by it, and to use and to permit to be used by and upon the lines of the various railroad companies so owned, controlled, leased, or operated by it, freight cars containing the designs and devices covered by patents now owned or controlled or which may during the said period be acquired, owned, or controlled by said Car Company. * * *

"Third. For each car hereafter built or caused to be built during the period of this contract by the Railroad Company (except cars constructed for the Railroad Company by the Car Company or by the Western Steel Car & Foundry Company) containing any of the designs or devices covered by patents now owned or controlled or which may hereafter be owned or controlled by said Car Company, the Railroad Company shall pay as royalty to the Car Company, within ninety (90) days after completion of such car, ten dollars ($10) per car in cash. * * *

"Fourth. The Railroad Company hereby gives to the Car Company and/or to a corporation known as the Western Steel Car & Foundry Company, a corporation organized and existing under and by virtue of the laws of the state of New Jersey, and for which company the Car Company in this regard will act as agent, a preference (provided they can make reasonably prompt or similar deliveries, under the same plans and specifications) over any other car builders in the construction of any or all freight cars containing designs and devices covered by patents now owned or controlled or which may hereafter be owned or controlled by the Car Company, caused to be built by the Railroad Company outside of its own shops, at the price of ten dollars ($10) per car in excess of the price bid by such other car builders for the construction of any freight cars embodying such designs and devices; the Railroad Company, however, reserves the right to build such cars in its own shops, in which event the Railroad Company agrees to pay to the Car Company a royalty of ten dollars ($10) per car for each car so built.

"Fifth. It is further agreed that if the Railroad Company abandons its present 'common standard' and adopts instead thereof a new design, which it contends does not embody any of the designs and devices covered by the patents now or hereafter owned or controlled by the Pressed Steel Car Company, and if such contention is disputed by the Car Company, then the question whether or not such new design does embody any design or device of patent owned by the Car Company, shall upon written request of either party to the other, be referred to * * * arbitrators. * * *"

Kiddle & Margeson, of New York City (John B. Stanchfield, Alfred W. Kiddle, Charles A. Collin, and Wylie C. Margeson, all of New York City, of counsel), for plaintiff.

George S. Payson, of Chicago, Ill., and Henry W. Clark, of New York City (George A. Ellis, James R. Sheffield, and James J. Cosgrove, all of New York City, of counsel), for defendant.

MAYER, District Judge (after stating the facts as above). The action is at law, and was tried without a jury, and numerous questions,

involving (1) the construction of contract relations and (2) the use of alleged infringing devices by defendant, were disposed of in the course of the trial.    Two questions remain to be considered, and both arise out of the contract referred to supra.

[1] 1. Plaintiff claims $10 per car on 200 gondola cars built for and delivered to defendant by the Betterndorf Axle Company, to which company, on or about August 17, 1909, plaintiff granted a license to build and sell cars covered by a patent to one Streib, No. 942,224, owned by plaintiff.   The license to the Betterndorf Company gave that company the right to make and sell freight cars embodying the improvements or inventions covered by what are the first three claims of the Streib patent.   The history of the arrangement between plaintiff and Betterndorf Axle Company may be briefly stated.   This history seems to be irrelevant, but is referred to, so that all the facts may be apparent.

An application for a patent covering, as is contended, the same invention as that set forth in the Streib application, was filed by one Betterndorf, and the Betterndorf application was placed in interference with the Streib application.   During this interference, Betterndorf conceded priority of invention to Streib, and plaintiff, as assignee of Streib, granted the Betterndorf Axle Company, as assignee of Betterndorf, a nonexclusive license whereby the Betterndorf Axle Company acquired the right to make and sell freight cars embodying the inventions covered by the first three claims of the Streib patent, without the requirement of paying plaintiff any royalty therefor.

The question now is whether defendant can be held liable for cars purchased from Betterndorf Axle Company which embodied claims 1, 2, and 3 of the Streib patent.   Plaintiff claims that it has the right to elect under which of the two outstanding licenses the cars in question were built.   In other words, the plaintiff, having given to Betterndorf Axle Company the right to manufacture and sell freight cars under the claims of a patent owned by plaintiff, now urges that it may segregate defendant from the rest of the public by virtue of the contract theretofore made between plaintiff and defendant.   When plaintiff granted the license to Betterndorf Axle Company, all the world was entitled to purchase cars from the licensee upon any terms suitable to the licensee and the purchaser.   In Keeler v. Standard Folding Bed Co., 157 U. S. 659, 666, 15 Sup. Ct. 738, 740 (39 L. Ed. 848) the court points out, with apt expression, that—

"The purchase of the article from one authorized by the patentee to sell it emancipates such article from any further subjection to the patent throughout the entire life of the patent. * * * "

The point is that the monopoly is lost and the article has been "emancipated."

It is quite immaterial as to what the arrangement was between plaintiff and Betterndorf Axle Company.   Such an arrangement sometimes takes the form of a royalty, and sometimes is entered into with considerations of mutual forbearance.   Whatever the consideration, whether called royalty or not, the passing of the consideration can occur but once, so far as affects the rights of purchasers.

The contract between plaintiff and defendant becomes immaterial, so far as relates to the right of defendant to purchase cars, made pursuant to the patent, from any person having the right to make and sell such cars.

I hold, therefore, that the defense on this ground is good, and plaintiff may note an exception to my ruling. If what has already been decided, in regard to the patent infringement features as to these 200 gondola cars, shall be sustained, then my ruling on this question of license will become academic.

[2] 2. The next question is one of damages. The plaintiff claims that it is entitled to recover substantial, and not nominal, damages by reason of the breach by defendant of the "fourth" paragraph of the contract, in that defendant did not accord to plaintiff, in respect of 702 cars, the preference therein set forth. It was held during the trial that what this provision for a preference meant was that defendant should give equal opportunity to plaintiff, with other car builders, to bid competitively for the construction of freight cars containing designs and devices covered by patents then owned or controlled, or which might thereafter be owned or controlled, by plaintiff company; and if plaintiff bid within not to exceed the $10 in excess of any other car builder, defendant was obligated to award the contract to plaintiff, with the proviso always that defendant could build cars in its own shops, in which event defendant was obligated to pay to plaintiff a royalty of $10 per car. The provision in question is a valid provision, and the breach thereof might entitle plaintiff to certain remedies; but the question now under consideration is whether, as a result of such breach, it can be said that it would be possible for plaintiff to show that it had lost what is spoken of as its manufacturer's profit, or, for that matter, that it had been subjected to any damage by way of loss of profits.

It is important to distinguish between those cases (1) where there is a rule of damage, but great difficulty and sometimes uncertainty in the ascertainment of what the damage is, and (2) those cases to which a rule of damage cannot be applied and where any damages awarded would be the result merely of speculation or conjecture.

The first class of cases is well illustrated by Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676, and Pennsylvania Steel Co. v. New York City Ry. Co., 198 Fed. 721, 754, 117 C. C. A. 503. The courts, in those cases, did not fail to lay down rules of damage, merely because of the difficulty of ascertaining damages.

The second class of cases is exactly illustrated by the case at bar and, inter alia, by Locker v. American Tobacco Co., 218 Fed. 447, 134 C. C. A. 247, and to some extent by Troy Laundry Machinery Co. v. Dolph, 138 U. S. 617, 11 Sup. Ct. 412, 34 L. Ed. 1083.

Counsel for each side have analyzed with great care the opinion in the Dolph Case and its history as exemplified by the record on review and the various steps which the litigation took. There is some language in the opinion of Mr. Justice Brewer which has led to considerable argument; but the fundamental proposition of the case does

not revolve around the question as to whether the provision there under consideration was a subordinate or principal provision. After all, the main questions were whether the breach of such an optional arrangement as was disclosed in the Dolph Case, and the provision as to "open competition," laid the foundation for substantial damages. That precise question was not present in the Locker Case, supra, but the principle is the same. It will be noted that the Circuit Court of Appeals, at the conclusion of its opinion in the Locker Case, said:

"As we have thus disposed of the case upon the principal question, it is unnecessary to discuss the subsidiary questions involved. We think it proper to say, however, that we find no satisfactory proof of damages; the matter seems to be left to speculation and conjecture."

The Locker Case was brought to recover treble damages under the so-called Sherman Anti-Trust Law (Act July 2, 1890, c. 647, 26 Stat. 209 [Comp. St. 1916, §§ 8820–8823, 8827–8830]), and was tried before the court with a jury. A mass of testimony was there introduced which, in the opinion of the court, failed to lay a foundation for damages except upon a mere speculative basis. The District Court, in that case, was of the opinion, therefore, that plaintiff, as matter of law, had not proved any damages and directed a verdict for defendant. It will be noted that the verdict thus directed was not for nominal damages, but it was for defendant on the theory that no damages whatever had been proved.

In the case at bar the first step necessary for the plaintiff would be to show that the plaintiff would have availed of the preference. There was no obligation on plaintiff's part so to avail, and whether the plaintiff would have so availed is a matter of speculation, which is but another way of saying that there existed a precedent element of such uncertainty, not as to the amount of damage, but as to the fact of damage, as to disable the plaintiff from laying any foundation whatever for damage. If the provisions of paragraph "fourth" were binding on both parties, so that, for instance, in addition to the right of plaintiff to bid, there would have been the binding obligation of plaintiff to bid, and to manufacture if the bid were properly awarded, then it might be argued that, if plaintiff's bid had not been accepted, it would have been damaged. In such circumstances, it might well be contended that the rule would have been simple enough, and would not have been embarrassed by any uncertainty.

But the difficulty is that no one can say, as of the time when the 702 cars were ordered and manufactured, that the plaintiff would have availed of the preference accorded under the fourth paragraph. In fact, there can be no better illustration of the complete uncertainty of this provision of the fourth paragraph than in this very case, because the testimony shows that in many instances, involving thousands of cars, plaintiff did not bid, and thus did not avail of the preference.

It seems to me, therefore, that any damages are purely speculative, and the logical result would be to allow the plaintiff no damage whatever in this regard. There is, however, some confusion in the cases as to whether no damage should be allowed or whether there should be

awarded to plaintiff nominal damages.  In the case at bar the financial result in this particular is substantially the same.

While, therefore, I think the proper conclusion requires that no damage be awarded to plaintiff, I am not disposed to decline to award 6 cents as nominal damages, if defendant so desires.  On this question of damages for loss of profits, counsel may arrange to shape the record so as to save the point, if the case should be reviewed.

When counsel shall have figured the correct amount to which plaintiff, under my rulings, is entitled, they will advise me, so that the record may conclude in orderly fashion.