## AMERICAN BRAKE SHOE & FOUNDRY CO. v. NEW YORK RYS. CO.

### EIGHTH AVE. R. CO. v. NEW YORK RYS. CO. et al.

### NINTH AVE. R. CO. v. SAME.

(District Court, S. D. New York.   June 28, 1922.   Supplemental Opinion, May 14, 1923.)

1. Receivers ⬤159(4)—Claims for rent not entitled to preference on receivership.
   Claims for rent for leased lines are not entitled to preference on insolvency and receivership of lessee company.

2. Receivers ⬤159—Lessor held not entitled to lien by reason of diversion of general funds.
   Diversion of general funds of lessee of street railways to payment of mortgage interest instead of rentals did not entitle lessors to an equitable lien superior to the lien of mortgagees.

3. Receivers ⬤163—Interest allowed on claim for rentals.
   On insolvency and receivership of lessee of street railroads, interest will be allowed on claims for rental.

4. Street railroads ⬤49—Lessee required to keep road equipped and return.
   Lessee of horse car line held required by the lease to keep the road equipped and return it in such condition after substitution of electric motive power.

5. Street railroads ⬤61(1)—Loss of franchise on failure to comply with conditions.
   Failure to comply with the conditions of street railway franchises may result in their loss, or subject the owner to other consequences.

6. Street railroads ⬤49—Lessors held entitled to return of equipment in kind.
   On insolvency and receivership of lessee of a number of lines operated as a unit, held, that lessors were entitled to a return of cars, tools, etc., in kind, and that the lessee was not only liable for money damages.

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. Street railroads ⊂⊃49—Lessor held to have title to equipment; "replace;" "revert."**

Under a lease of street railway line requiring lessee to "replace" and make good equipment by the substitution of other equipment, all equipment to revert to and become the property of the lessor at the termination of the lease without charge, *held*, that the lessor acquired title to all equipment immediately on its acquisition by the lessee, as property could only "revert" if the revertee had title (citing Words and Phrases, "Revert.").

**8. Street railroads ⊂⊃49—"Redeliver," as used in lease, means delivery back of another's property.**

"Redeliver," within the meaning of a lease of a street railway line, providing for redelivery on termination of lease means to deliver back another's property.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Redeliver.]

**9. Equity ⊂⊃1—Meets new problems and new conditions with appropriate decrees.**

Equity is always alert to do what is just and fair, and in the light of new developments and experience meets new problems and new conditions with appropriate decrees.

**10. Street railroads ⊂⊃49—Lessors held entitled to apportionment of cars operated on other line.**

Lessors of street railway lines, under leases requiring delivery to the lessors, at the termination of leases of equipment substituted for that demised, are entitled to have the cars of the lessee apportioned in kind, though the lessee treated all the lines owned or leased as a unit and bought cars out of general funds.

**11. Street railroads ⊂⊃49—"Reasonable conveniences and facilities," to be provided by lessee, meant facilities necessary at termination of lease.**

Under a lease of a street railway line, requiring lessee to maintain "all reasonable conveniences and facilities" and to return the line with equipment at termination of the lease, *held* that, on termination of the lease, the lessee should turn over to the lessor such equipment and cars as might be necessary to meet its then operation over its own franchise routes.

**12. Street railroads ⊂⊃49—Test applied in apportioning cars on termination of leases stated; "reasonable conveniences and facilities."**

Where lessor of street railway line was entitled on termination of the lease only to such cars as were necessary to accommodate the public "with all reasonable conveniences and facilities," such conveniences and facilities must be ascertained by taking into consideration the practical operation of the line for a reasonable time prior to the date of return and the changed requirements, if any, as affecting passenger traffic, which operation separate from lessee's other lines would produce.

**13. Street railroads ⊂⊃49—Apportionment of equipment on termination of leases.**

On termination of leases of street railway lines operated by lessee, as a unit, but required to be returned in equipped condition, apportionment of lessee's tools, implements, and other equipment between the lessors should be made on the basis of car mileage, in connection with other facts.

**14. Street railroads ⊂⊃49—Equipment allocated to leased line delivered to lessor on termination of lease.**

Where a number of lines were operated by lessee as a unit, and leases required that all equipment used be surrendered on their termination, any equipment which could be identified as definitely allocated to a leased line should be delivered to that line, and should not go into an apportionment along with the other equipment.

**15. Street railroads ⊂⊃49—Public interest to be considered in apportionment of equipment between lessors.**

On insolvency and receivership of lessee of street railway lines, the public interest must be considered on an apportionment of equipment in kind between the lessors.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

16. Street railroads ⊜⟿49—Lessee held required to deliver up equipment on termination of lease.

A lease of a horse car line, contemplating a change from horse power to electric motive power, *held* to require delivery on termination of the lease of all equipment used, notwithstanding a provision that the lessee had the right without accountability to the lessor, to sell or dispose of all equipment, for its own use, when it had expended the sum of $1,000,-000 in substituting motive power in place of horses.

17. Street railroads ⊜⟿55—Lessors of street railway line held not bound by decree on foreclosure of mortgages.

Lessors of street railway lines operated with other lines as a unit by the lessee were not bound as to title to equipment by a decree in a foreclosure proceeding between mortgagees and the lessee, not being parties thereto.

18. Street railroads ⊜⟿54—Mortgagees held not to have lien on equipment to which lessors were entitled.

Mortgagees of a lessee operating a number of street railway lines as a unit had no liens under after-acquired property clauses on cars, which lessors were entitled to have apportioned to them on termination of the leases; the mortgagees being in no sense purchasers for value without notice.

19. Street railroads ⊜⟿49—Creditors of lessee of lines not entitled to preference over lessors by reason of possession of property.

Since materials, equipment, and supplies of public utility corporations are not regarded as chattels in the ordinary sense because needed to enable quasi public corporations to carry out their franchise duties, the rights of lessors, as against a lessee of lines operated as a unit, to apportionment of cars and equipment on termination of leases, are not affected by any rights of general creditors, who relied on the possession of the property by the lessee when they extended credit to it.

Receivership suit by the American Brake Shoe & Foundry Company against the New York Railways Company, in which Job E. Hedges was appointed receiver of the defendant company. Petitions by the Eighth Avenue Railroad Company and the Ninth Avenue Railroad Company for apportionment of equipment and other relief. Decrees for petitioner (affirmed in 293 Fed. 633).

See, also, 277 Fed. 261; 278 Fed. 842; 282 Fed. 293, 523; 291 Fed. 107, 112.

These suits were brought by the Eighth Avenue Railroad Company and the Ninth Avenue Railroad Company, respectively, after the properties of these companies, formerly held by the New York Railways Company under lease, had been returned to them by the receiver of the New York Railways Company pursuant to court order. In each suit relief is demanded:

(1) That judgment be rendered against the New York Railways Company for an amount representing the unpaid rental due under the leases at the time of the appointment of the receiver, including taxes.

(2) That the plaintiff be declared to have an equitable lien for the amount of the said rental superior to the lien of the mortgages made by the New York Railways Company.

(3) That the receiver be ordered to return to plaintiff its street surface railroads, together with all other property connected therewith and used or necessary for use in the operation of said street surface railroad not already delivered to plaintiff, including extensions and branches thereof, and that the personal property already delivered to plaintiff with reservation of right of title be determined to be the property of the plaintiff.

The issues and facts in the two suits are so similar that by agreement the same testimony was taken as applicable to each suit. For brevity, the following abbreviations will be used:

⊜⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

N. Y. Rwys. Co. for New York Railways Company; 8th Ave. Road for Eighth Avenue Railroad Company; 9th Ave. Road for the Ninth Avenue Railroad Company; Broadway Co. for Broadway & Seventh Ave. R. R. Co.; Guaranty Co. for Guaranty Trust Company of New York; Farmers' Co. for the Farmers' Loan & Trust Company; Metropolitan Co. for Metropolitan St. Railway Company; The Belt Line Case for Penn. Steel Co. v. N. Y. City Rwy. Co. (C. C.) 165 Fed. 472; the Second Ave. Case for Morton Trust Co. v. Metropolitan St. Ry. Co. (C. C.) 165 Fed. 489: the Third Ave. Case for Central Trust Co. v. Third Ave. R. R. Co. (C. C.) 165 Fed. 479.

Michel Kirtland, of New York City (Morgan J. O'Brien, of New York City, of counsel), for plaintiffs.

Winthrop & Stimson, of New York City (George Roberts and G. Herbert Semler, both of New York City, of counsel), for receiver of New York Rys. Co.

Stetson, Jennings & Russell, of New York City (Edwin S. S. Sunderland, of New York City, of counsel), for defendant Guaranty Trust Co., of New York.

Geller, Rolston & Blanc, of New York City (Mansfield Ferry and Henry N. Flynt, both of New York City, of counsel), for defendant Farmers' Loan & Trust Co.

Loucks, Griffin, Connet & Cullen and Patterson, Eagle, Greenough & Day, all of New York City (William Greenough and William H. Griffin, both of New York City, of counsel), amici curiæ.

MAYER, Circuit Judge (after stating the facts as above). A. On March 12, 1892, 9th Ave. Road let its horse car line to the Houston, West Street & Pavonia Ferry Railroad Company, which later (in December, 1893) merged and consolidated with other companies to form the Metropolitan Co. On November 23, 1895, 8th Ave. Road let its horse car line to Metropolitan Co., which company had previously in May, 1894, and November 13, 1895, absorbed several other railroad companies by further merger and consolidation. Passing by intermediate history, the time came when 9th Ave. Road and 8th Ave. Road were lessors and N. Y. Rwys. Co. was lessée under the leases supra.

On March 20, 1919, this court made its order (in the suit first mentioned in the caption) appointing a receiver of the property of N. Y. Rwys. Co. and on July 1, 1919, and July 14, 1919, orders were made on application respectively of Guaranty Co., as trustee, and of Farmers' Co., as trustee, appointing a receiver of the property covered by certain mortgages infra. On July 15, 1919, an order was made directing the receiver to return to 8th Ave. Road the property in his possession owned by said road, and on October 22, 1919, the court ordered certain additional property to be turned over to the same road. Orders of similar import were made in respect of the 9th Ave. Road on September 26, 1919, and September 30, 1919. When the property of these respective roads was returned to them, there was due to each of them certain sums for rentals including unpaid taxes. Plaintiffs now demand the relief outlined in (1) and (2) supra for these unpaid amounts.

[1] It is settled in this circuit that claims for rent such as here presented are not entitled to any preference. Pennsylvania Steel Co. et

al. v. New York. City Ry. Co. et al. (D. C.) 208 Fed. 168, at page 171, affirmed 216 Fed. 458, at page 473, 132 C. C. A. 518. This rule is amply supported by similar decisions in many cases. Thomas .v. Western Car Co., 149 U. S. 95, 13 Sup. Ct. 824, 37 L. Ed. 663; Central Trust Co. of New York v. Charlotte, C. & A. R. Co. (C. C.) 65 Fed. 264; Stevenson v. Marble (C. C.) 84 Fed. 23; Louisville & N. R. Co. et al. v. Central Trust Co. of New York, 87 Fed. 500, 31 C. C. A. 89; Gregg v. Mercantile Trust Co., 109 Fed. 220, 48 C. C. A. 318; St. Louis Merchants' Bridge Terminal Ry. Co. v. Continental Trust Co., 111 Fed. 671, 49 C. C. A. 529.

[2] Plaintiffs .insist that prior to the receivership there was a diversion of the general funds of the N. Y. Rwys. Co. by virtue of the payment of mortgage interest, instead of rentals, and Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, is cited in support of their present contention that they are now entitled to the judgment prayed for or to the declaration of an equitable lien superior to the lien of the mortgages. That well-known and frequently cited case is authority, inter alia, for the payment of current debts for labor and supplies, but does not at all support the contention of plaintiffs. Indeed (99 U. S. at page 255, 25 L. Ed. 339), its holding is to the contrary.

The result is that plaintiffs are not entitled to the relief (1) and (2) supra as prayed for. Plaintiffs, however, may have appropriate orders authorizing the filing of their claims nunc pro tunc as of June 16, 1919, and, as appears from the brief submitted on behalf of the receiver, there should be no difficulty in ascertaining the correct amount and thereupon allowing these claims.

[3] Interest will be allowed in accordance with American Iron Co. v. Seaboard Air Line, 233 U. S. 261, 34 Sup. Ct. 502, 58 L. Ed. 949, Penn. Steel Co. v. N. Y. City Ry. Co., 216 Fed. 458, at page 471, 132 C. C. A. 518, and Pintsch Compressing Co. v. Buffalo Gas Co., 280 Fed. 830; C. C. A. Second .Circuit, decided April 3, 1922.

B. *Paragraph (3) of the relief prayed for, supra, so far as affects cars, tools, and other equipment.*

The most satisfactory approach to the consideration of the questions involved under this head will be to ascertain, first, the rights of the parties, i. e., lessor and lessee, as between themselves; secondly, the rights of the mortgagees and thirdly, the rights of creditors.

*9th Ave. Road Lease.*—At the date of the execution of the lease the 9th Ave. Road was a horse car line. As appears by the provisions of the lease itself, the parties contemplated that there might come a time when cable traction, electricity, or some other system of motive power would be substituted for the horse-drawn method. An appreciation of the importance of this expectation in the minds of the parties will be helpful in construing the lease. It was provided in one of the paragraphs (called for brevity "Par. I," infra):

"But it is mutually understood and agreed that if, at any time during the term of this lease, the party of the second part, its successors or assigns, shall desire to dispense with the use of animal power for the operation of the railroad hereby demised, or any extension or branch thereof, and shall elect to *substitute* a cable traction, electricity, or any motive power other than lomomotive steam power, for the propulsion of the cars to be run on the

railroad hereby demised or any extension or branch thereof, the said party of the second part after taking such proceedings as may be prescribed by law to authorize and effect such change of motive power, may *substitute* any power, other than locomotive steam power, for the propulsion of the cars run or to be run on the railroad hereby demised or any branch or extension thereof. And in case of any such change of motive power, any of the horses, cars, harness, equipments or other personal property then belonging to the railroad hereby demised, which shall thereby become useless or unnecessary for the purposes of the railroad hereby demised, may be sold and disposed of by the party hereto of the second part, its successors or assigns, provided that the machinery, new cars and equipments which the party of the second part may supply and provides for the operation of said railroad by such *substituted* motive power shall be of greater value than the said horses, cars, harness and other equipments so to be sold or disposed of; it being expressly understood and agreed that any new equipments, cars, horses, motors, machinery, fixtures, tools, implements, or equipments of any and every kind which the party of the second part, its successors or assigns may provide, purchase, *substitute* or supply for the operation of the railroad hereby demised, or any branches or extensions thereof, and also any new rails, tracks, betterments or improvements, of any and every kind, which may be constructed, made, laid, supplied or provided by the party of the second part for the maintenance, operation or use of said railroad hereby demised, or any branches or extensions thereof at any time during the term hereby demised, shall *at the end* or sooner determination *of this lease* revert to, and become the property of the party of the first part, without charge or expense to it, and without any deduction from the rent reserved by this lease."

From the foregoing, it is obvious that the parties realized, in the event of the substitution of some electrical or mechanical motive power for the horse car system, that the line as a horse car line would be destroyed or, in other words, transmuted into a different kind of line, requiring, among other things, different kinds of cars and different kinds of tools and implements. It is plain that what the lessor sought to accomplish was the preservation of the leased property as an equipped railroad. It is difficult to imagine a purpose more clearly manifested.

The horses, cars and equipment, however, were then the property of the lessor, which could not be sold without its consent, and therefore it was provided that the lessee could sell and dispose of this property, provided that the machinery, new cars and equipment which the lessee supplied for the operation of the road by new motive power, should be of "greater" value than the horse car property disposed of. In all or nearly all of the leases of this character entered into in the '90's the substituted property was required to be of "equal" value. The word "greater" is not entitled to much emphasis, but is useful as pointing out that the parties must have realized that adequate equipment of a cable or trolley line would necessarily involve the use of property greater in value than the property of a horse car line and it may fairly be inferred that the lessor insisted upon this provision.

It will be also noted that the word "substitute" or "substituted" is used several times in appropriate relation in Par. I. At the beginning of the paragraph, the lessee, at its election, may substitute a cable traction, electricity, or other motive power. Substitute for what? Plainly, for a horse car line, which would be eliminated when the use of animal power was dispensed with. Throughout this entire paragraph, it is clear almost beyond argument that the parties were con-

tracting in respect of the probable disappearance of a horse car line upon the theory that the line operated with new motive power should in every respect be a substitute for the disappeared horse car line.

The paragraphs of the lease preceding Par. I serve to fortify this conclusion. The lease was for 99 years and the lessor let to the lessee, inter alia, all the cars, horses, and equipment belonging to the railroad. The lessee was obligated during the term of the lease to keep the property in good working order, condition, and repair and keep the railroad supplied—

"with proper motive power, rolling stock and equipment so that the traffic and business of said railroad and of any extensions or branches thereof, shall be preserved, encouraged and developed, and that the same may be at all times done with safety and expedition, and so that the public may be accommodated in respect to transportation with all reasonable conveniences and facilities, and so that all future growth of the business of the railroad hereby demised with any extensions or branches thereof as the same may arise, or be reasonably anticipated, shall be fully provided for and secured, and the party of the second part hereby promises and agrees to and with the party of the first part, that the said party of the second part shall and will at its own proper cost and expense, from time to time, and whenever needed during the said demised term, do or cause to be done to and upon the railroad and premises hereby demised any and all repairs, replacements and renewals, and also any and all additions, constructions and improvements which may be reasonably required for the purposes aforesaid, and will provide thereon and therefor such rolling stock, motive power and equipments and other facilities as shall or may be reasonably required for the purposes aforesaid, and that the said party of the second part shall and will use all reasonable efforts to maintain, develop and increase the business of the said railroad hereby demised as the same now exists and as the same may be hereafter extended by any additions thereto or branches thereof" (hereinafter called "Par. II").

The foregoing provision indicates, of course, that the lessor desired to preserve and maintain the good will of the road. This provision, read with the context of the lease, is another evidence of the purpose of the parties that, at any time, if the road were returned to the possession of the lessor, it should be returned as an equipped railroad. When considering the road only as a horse car line, the parties were careful to provide for the replacement of dead horses or destroyed or useless equipment. They therefore covenanted:

"And in case any of the horses hereby demised shall die or become worn out or disabled from use, and if any of the said cars, harness, tools, implements, machinery or other property belonging to the railroad hereby demised shall be destroyed or become worn out or unfit for use, the party of the second part hereby agrees to replace and make good all such horses, harness, cars, tools, implements, machinery, and other property and equipments, by the substitution of others as good or better than those hereby demised" (hereinafter called "Par. III").

[4] Thus it will be seen that, when the parties were dealing with the continuance of a horse car line, they agreed that the horse cars and equipment should at all times be at least equal to what was on hand at the time of the execution of the lease, so that if the lessor took back its property as a horse car line it would be able to continue without interruption in that regard the operation of its road and the consequent service to the public. The point is that whether viewed as a horse car line or an electric motive power line, there runs throughout

the lease, the purpose continuously to keep an equipped road and ultimately return an equipped road.

It must be remembered that franchises or governmental consents of one kind or another are granted ordinarily upon conditions as to the service which shall be rendered to the public. Two instances (one before and the other after the date of the lease) may be taken at random to illustrate this well known practice. Thus the common council in 1858 granted the right to construct a railroad from Fifty-First street to the Battery, "provided that the said grantees shall run cars * * * each way * * * every day * * *." Compilation of N. Y. Rwys. Franchises 1914, pp. 768 et seq.

Again, on October 18, 1892, a consent to an extension was given by the Common Council under resolutions which set forth, inter alia: '

"That the condition upon which. and not otherwise, the said consent is hereby given shall be and are, as follows: * * * Fourth, That the cars shall be run upon such branch or extension as frequently as the convenience of the public may require." Compilation of N. Y. Rwys. Franchises 1914, p. 625 et seq.

[5] Failure to comply with the conditions of franchises may result in their loss or subject the owner to other consequences, as illustrated in People v. Bleecker St. & Fulton Ferry R. R. Co., 67 Misc. Rep. 577, 124 N. Y. Supp. 782, affirmed 140 App. Div. 611, 125 N. Y. Supp. 1045, and finally affirmed 201 N. Y. 594, 95 N. E. 1136, construing chapter 178 of the Laws of 1880 of New York, being subdivision 1, section 1948, of the New York Code of Civil Procedure. The statute just mentioned was in force at the time of the execution of the 9th Ave. lease, and there were compelling reasons, therefore, why the lessor desired to protect itself against the return of a road without cars and equipment.

When, therefore, it is seen that the lease provided for the maintenance of the road while it was a horse car line in at least as good condition in respect of the property to be used as when the lease was executed, so that, in the event of the termination of the lease, the road would be returned to the lessor as an operating road with operating equipment at least equal to that which existed at the time of the execution of the lease, it must follow that the parties intended precisely the same condition and result in the event of the return of an electric motive power road, except, of course, that the character of the operative equipment would necessarily be different. When, by order of this court, the road was returned by the receiver, the line had been electrified, and it is plain that this electrified line was the substitute for the old horse car line in every sense of the word "substitute."

In the Belt Line Case, the situation was quite different, as may be ascertained by an examination of the Belt Line lease. In that lease, it was provided that, whenever it should be deemed by the lessee expedient to change the motive power of the railroad, then upon the lessee's request the lessor should authorize, execute and deliver to the lessee negotiable bonds of the lessor for the expense of such change. In a prior part of the lease was a provision as to the return of horses, cars, and equipment or their substitutes, in substance like the provi-

sion Par. III supra in the 9th Ave. Road lease. There was no obligation on the part of the 9th Ave. Road as lessor to change the motive power and the expense of such a change, if desired by the lessee, was to be borne by the lessee and, in any event, not by the lessor.

When the Belt Line was returned, the situation was quite different from that of the 9th Ave. Road. The lessee, at its own expense, had changed the horse car tracks over part of the road to an electric conduit. From what is said in Judge Lacombe's opinion (165 Fed. at page 475) in the Belt Line Case, it would seem that no part of the construction nor any part of the cost of equipment was paid for by the lessor. Apparently the provision of the lease as to the issuance of bonds was not availed of because the court said also at page 475 that the lessee "received from the lessor neither bonds, stock, nor even notes for any part of this improvement, which greatly enhanced the value of the property." The result was the court concluded that the electric cars which had been bought by the lessee and had been operated upon the new track were not the "designated substitutes" of the old horse cars. That conclusion was justified by the facts of the case, because the lease did not contemplate that the change in motive power should be made at the expense of the lessee, but, on the contrary, affirmatively required that the lessor, if requested, should issue the necessary bonds for the expense. The court also pointed out that, as the original cars of the Belt Line could be run over the new track, the lessor would have had all it was entitled to if the original cars had been kept "in perfect condition by the lessee and returned on termination of the lease." Apparently, because these original cars were used on other lines and in time disappeared without providing others in their place, there were no cars which could be delivered to the Belt Line and thus the Belt Line was remitted to the assertion of a claim for damages.

Nowhere in the Belt Line Case is there to be found any such definite provision as to substitution in the event of a change of motive power, as is elaborately set forth in the 9th Ave. Road lease in Par. I. The Second Avenue Case is not in point on this branch of the case, because the 275 cars there involved were identifiable, and, in ordering the return of those cars, the court was not confronted with the question here under consideration.

From the foregoing, it follows, therefore, that so far as concerns the cars, the parties to the 9th Ave. lease clearly intended that any new cars which the lessee, its successors or assigns, would "provide, purchase, substitute or supply for the operation" of the leased railroad should be substitutes for the horse cars rendered useless or unnecessary for the operation of the electrified road.

No different result can be reached in respect of tools, implements, equipment, etc. The parties clearly understood and realized that, if the motive power were changed, much of the equipment of the horse car line and possibly all would become useless and that new and appropriate tools, implements, etc., would be needed for the electrified line. These tools, etc., are vitally necessary in connection with operation and, therefore, as a reading of the lease discloses, tools, implements, etc. were treated in the same way, and in the same paragraph

(Par. I), as were cars, and consequently it is plain that the new tools, etc., were to be substitutes for the old tools, and it is equally plain that the new tools were and are necessary to the operation of an electric motive power railroad, just as the old tools, etc., were necessary to the operation of the horse car road.

[6] The next question is whether, as between the parties, under these and other provisions of the lease, the lessee was to return the cars, tools, etc., in kind or was liable only for the performance of a personal covenant, the breach whereof could be redressed by money damages.

Having pointed out, supra, that under this lease it was the intent of the parties that the new cars and other equipment should be the substitute for the old, is it supposable that the lessor intended that at the termination of the lease his sole redress would be a claim for damages? Plainly not. Par. II, supra, shows the lessor's purpose to assure service to the public at all times so that the lessor might hold and develop its good will. Not only was the then property to be kept in good order but "all future growth" was to be "fully provided for."

If car No. 1, with an identification plate marked as definitely assigned to the 9th Ave. Road, had been the first car run in substitution for horse cars, and had been run continuously thereafter until, say, 10 days before the receivership and during these 10 days had been run on some other line, can there be any doubt that the 9th Ave. Road would have been entitled to that car? This inquiry suggests the danger of confusing the question of title as contemplated under the lease, with the practical difficulty of finding an identified car in the receiver's possession. The two questions must be kept separate, for only by so doing can a sound conclusion be reached.

What is being considered at this stage of the discussion is the structure of the lease, to ascertain whether it was intended that title should immediately attach to cars, tools, etc., when they were acquired as substitutes, remembering always that it was the lessee's duty to provide such substitutes.

[7] If the horse car road had remained unchanged, the lessee was required "to replace and make good" destroyed equipment "by the substitution" of other as good or better "than those hereby demised" (Par. III). "Replace" is an unambiguous word, which, as used in Par. III, means that there shall always be horses, cars, equipment, etc., as least as good as those demised, and "demised" is a word of art. To "replace" demised property, title to which is in a lessor, must mean that title to the new property immediately vests in the lessor upon replacement, else "replace" has no significance.

When, therefore, later in the lease (Par. I) the parties were dealing with new motive power, the structure of the lease and the intent of the parties were the same, so far as concerns title; but different words of art were used. A new electric motive car may be substituted for a horse car, but one ordinarily does not speak of "replacing" one kind of property by another kind of property. Hence "replace" is not found in Par. I, but the words used are "provide, furnish, substitute, supply." At the end of the lease by limitation or sooner determination the prop-

erty was to "revert to" the lessor. "Revert" is also a word of art used in contracts and wills. It means "to turn or throw back; to return." Standard Dictionary. "If his tenant and patentee shall dispose of his gift without his kingly assent, the land shall revert to the king." Bacon, cited in Century Dictionary. See, also, Words and Phrases, First and Second Series, with many cases cited.

In other words, the lease provided that the property mentioned should be turned back to the lessor; and property "to revert" must be property to which the "revertee" has title. It is urged, however, that the words "shall * * * become the property" mean shall only then—i. e., at the termination of the lease—become the property. The word "become" was construed in People ex rel. International Nav. Co. v. Barker, 153 N. Y. 98, 101, 47 N. E. 46. It is true that that case dealt with some questions of real property, but its pertinence here is the construction of the word "become."

Besides, there are other words following "revert to" and "become," which must not be passed by. The phrase is "shall * * * revert to, and become the property" of the lessor "without charge or expense to it and without any deduction from the rent. * * *" In the event of the substitution of an electric road for a horse car road, there were many classes of property to "revert to and become" lessor's property. All this new property would presumably cost much new money. It was, therefore, desirable to eliminate any question as to any right of lessee to charge anything for the new property.

This phrase, "without charge" to the lessor, or some similar phrase, is used a number of times throughout the lease. Thus, in a preceding paragraph, in connection with the construction of a branch from Columbus avenue near Sixty-Fourth street, it is provided that the expenses shall be paid by the lessee "without charge" against the lessor and "without any deduction from the rent reserved by this lease." Later in the lease, when referring to dividends, the phrase is "without any deduction" on account of tax. Again, when referring to street paving, the lessee is obligated to pay judgments recovered by the then municipal corporation against the lessor, "without any deduction from the rent reserved by this lease."

The clause at the conclusion of Par. I was not intended to mark a time when the new cars, tools, implements, tracks, etc., were to become the property of the lessor, but was designed to make clear that when the lease ended by limitation or for some reason was sooner terminated, the cars, tools, implements, tracks, etc., were to revert to the lessor and to become its property without charge or expense to it. The emphasis is upon "without charge or expense" and "without deduction from the rent," so that the lessee could never claim that, because it had expended more money than was represented by the old horses, cars, etc., it would thereby and therefore be entitled to reimbursement.

A significant illustration in support of this conclusion is found in the language relating to the Columbus-Amsterdam Avenue extension. The tracks and other affixed property of a branch or extension would surely have become the lessor's property at once, under the principle of the International Nav. Co. Case, supra. When the lease provides

that "the said branch or extension * * * shall belong to and be the property" of the lessor, "at the end or sooner determination of said demised term," both from the nature of the property and the language, as interpreted in the case just referred to, this provision must be construed as not intended to delay vesting title until the termination of the lease. Here, also, the point was that the branch or extension was to belong to the lessor at the end of the lease (i. e., when delivered back) "without charge or expense whatsoever and without deduction from the rent, * * *" and the emphasis was on that phrase.

[8] Finally, to make assurance doubly sure, in the second to last paragraph, the technical words "redeliver and surrender up" were used as applying not only to the property demised, but also to "other" and to "all additional motors, cars, rolling stock and equipments of any and every kind which shall have been acquired or provided" by lessee "for use upon said railroad with any extensions or branches thereof at any time after the commencement of this lease." "Redeliver" means, of course, to deliver back another's property. Surrender of a leasehold is "the yielding up of the estate to the landlord, so that the leasehold interest becomes extinct by the mutual agreement of the parties" (37 Cyc. 617, 618), and means the giving up to the landlord of that which is his property. It follows, therefore, from the whole tenor of the lease, fortified and illustrated by technical language, that the parties intended that, upon acquisition, title should at once attach in favor of the lessor to the cars, tools, and other classes of property described in the lease.

Thus far, the discussion has been confined to the construction of the lease. In the lease, there is no authority for the use by the lessee of the property therein described on any but the lessor's road. If it was contemplated that the lessee could use the cars, etc., on other roads, the lease should have so provided. The fact that the lessor might get back a much more expensive and modern railroad than it had let in 1892 is not material because the parties so contracted. But, owing to subsequent events, we are faced with the practical problem of finding the cars and other property, and at this point it becomes necessary to divide the discussion into two heads—(1) cars; (2) tools, implements, etc.

The Metropolitan system grew into a great unified system. Operated routes were not necessarily identical with franchise routes. Traffic requirements constantly change, because of shifts of population and many other reasons. Good railroading demands elasticity of operation, more cars on one route, less on another, and different types of cars in different proportions, as occasion may require.

The result is that no car can be identified as definitely assigned or allocated to 9th Ave. Road. If a particular car were operated only a day on the road, no one would say that such car was thereby allocated. On the other hand, it would not be a fair test as applied to either party to hold that the cars operated on a particular day, such as the date of return, or the date of the appointment of the receiver, were the property of lessor, any more than that the coal in the Third Avenue Case was the property of that railroad because it happened to be on

its property. Such a method, among other things, might produce too many cars, to the prejudice of lessee, or too few, to the prejudice of lessor.

But because cars cannot be identified it does not follow that a claim for damages is the only redress. The case has some aspects like the stock brokerage cases. It is true that in such cases other legal relationships exist, but the fundamental aim of the courts is the same, and that is to work out an equitable solution. In re Hollins & Co. (D. C.) 212 Fed. 317; Duel v. Hollins, 241 U. S. 523, 36 Sup. Ct. 615, 60 L. Ed. 1143; In re J. C. Wilson & Co. (D. C.) 252 Fed. 631, 640. The problem here presented did not precisely arise in the Metropolitan Co. receivership, as appears from the comment on the Belt Line and Second Avenue Cases, supra.

[9] Equity, however, is always alert to do what is just and fair, and in the light of new developments and experience meets new problems and new conditions with appropriate decrees. While 9th Ave. Road was not ready to operate for many reasons set forth in American Brake Shoe & Foundry Co. v. New York Railways Co., 282 Fed. 293, decided June 7, 1920, affirmed June 21, 1922, in 282 Fed. 523, nevertheless, as between it and its lessee, it was entitled upon the return of its road to sufficient cars, if the receiver had them. The lessee could not enrich itself by mingling the cars, or failing to establish or keep their identity. A claim for damages would not be an adequate remedy, as will appear infra. If the receiver had no cars whatever in his possession, the lessor would be compelled to make a virtue of necessity, but the receiver had cars in his possession. May the lessee, via the receiver, keep as its property these cars because it has failed to observe what have been held supra to be the plain obligations of the lease?

Suppose there were no receiver, and the lessor (to use simple figures merely for illustration) needed 100 cars to run its road, and the lessee had 101 cars, could the lessee successfully defend on the ground that it needed the 101 cars, and that, having mingled the 100 cars which the lessor needed with the one car it (the lessee) owned, lessor must sue for damages? As stated above, that would not be an adequate remedy. Cars cannot be bought over the counter. Nonoperation for lack of cars might subject the road to loss of franchises, and possibly other penalties. But, laying aside such possibilities, the failure to operate or to operate adequately may lead to loss of patronage which, owing to the nature of the case, cannot be measured by any rule of damage.

Whether the road operated separately would have operated at a profit or loss was at the time of the return a matter of speculation; but if the road had ceased operating until it was able to obtain cars, its passengers would have been diverted to other lines, and those familiar with the pending receiverships do not need tables of statisticians to prove that, when a passenger becomes accustomed to another line, he is not likely to return to the first line when service shall be restored. Thus certain elements of damage would be unascertainable because speculative.

[10] It is plain, therefore, that some equitable disposition should be worked out, and the only practicable solution is to apportion the cars.

and such solution should not be prevented because the lessee treated the system as a whole and thus bought cars out of general funds. If there were only the lessor and lessee companies, the apportionment would be simple enough. Meyer v. Johnston, 53 Ala. 237, 332; Louisville Trust Co. v. Cincinnati Inclined Plane Ry. Co. (C. C.) 91 Fed. 669 illustrating simple apportionments under other circumstances). It would then be necessary merely to ascertain the total number of cars to which the lessor was entitled, and to require that number of cars to be turned over to the lessor.

But the situation is complicated by the fact that the receiver cannot safely nor justly turn over a given number of cars until he knows what are the demands, if any, of other lessors similarly situated. If that were ascertained, then the apportionment could be worked out as in Duel v. Hollins, supra. To illustrate: If all the lessors were entitled to 100 cars, and this particular lessor to 10 cars, but the receiver had only 80 cars, then he would be able to apportion to each lessor only eight-tenths, which, under this illustration, would apportion 8 cars to this lessor.

[11] But the case at bar is not quite so simple as this illustration. It must first be determined to how many cars the lessor is entitled. Referring again to the lease, it will be remembered that it was provided that the lessee should keep the railroad so supplied that "the public may be accommodated in respect to transportation with all reasonable conveniences and facilities, and so that all future growth of the business of the railroad hereby demised with any extensions or branches thereof as the same may arise, or be reasonably anticipated, shall be fully provided for and secured."

The expression "all reasonable conveniences and facilities" is an elastic term responsive to changing conditions. What may have been reasonable in 1900, might not be reasonable now. The lease necessarily permitted the lessee a proper range of discretion as to the number of cars necessary from time to time to afford the reasonable conveniences and facilities referred to in the lease; but it was contemplated that when the road would be returned, the lessee should turn over to the lessor such cars as might be necessary to meet its then operation over its own franchise routes.

A lessor is not entitled in such circumstances, to the numbers of cars adequate for operation on other than its franchise routes. If at the time of return the franchise route of a lessor company is from A. to B., but the operated route (including franchises of other companies) is from A. to C., and 5 cars would be necessary for the A.–B. route, and 10 cars for the A.–C. route, the lessor would, of course, be entitled to 5 and not 10 cars.

[12] The next practical requirement of a fair apportionment necessitates the ascertainment of the different kinds or types of cars to be delivered to the lessor. Some cars are larger than others, and some cars differ as to kinds and places of entrance and exit. Some are passenger cars; others are work or other nonrevenue cars. Some cars which would be suitable for the 9th Ave. Road might not be suitable for operation elsewhere, and vice versa. In determining to how many

and what kind of cars the lessor is entitled, it must be remembered that it is entitled only to such as were necessary to accommodate the public on the date of return "with all reasonable conveniences and facilities," and what were then such conveniences and facilities must be ascertained, inter alia, by taking into consideration the practical operation of the 9th Ave. Road for a reasonable time, prior to the date of return and the changed requirements, if any (greater or less), as affecting passenger traffic, which separate operation would produce.

To recapitulate: In order to work out an apportionment, it will be necessary to ascertain, first, the number and kinds of cars to which the 9th Ave. Road was entitled on the date of return; and, secondly, the number of cars which may be claimed by other lessor companies. It may be that there are sufficient cars, so that the full number may safely be delivered to the 9th Ave. Road. If not, that road, if so advised, may file its claim for damages arising from failure to deliver the full quota.

I suggest that the parties, without waiving their rights, stipulate, if possible, as to the number and kinds of cars' necessary for the 9th Ave. Road on the date of return. If this cannot be accomplished, I will take up this and other matters of detail on the settlement of the decree.

*Tools, Implements, etc.* (hereinafter for brevity called equipment).— While, as above indicated, apportionment of cars is not a mere matter of automatic selection or allocation, yet the task may be accomplished with an approximation to accuracy because primarily the number of cars necessary for the operation of the 9th Ave. Road may be ascertained with regard solely to its own requirements and without regard to the requirements of other roads or lines. Thus, the Lexington Avenue line might require 200 cars, but that fact would not add nor subtract from the number of cars needed for the 9th Ave. road operation. If a car were taken from the 9th Ave. Road and run on the Lexington Avenue line, and in place of the car thus transferred to the Lexington Avenue line a car from the Columbus Avenue line were used on the 9th Ave. Road, such distribution would not affect the number of cars necessary either for the Ninth Ave. Road or the Lexington Avenue or the Columbus Avenue roads—which latter are owned roads.

But in the case of equipment the practical situation is quite different. It would be quite natural that equipment would be pooled and treated in practice as applying to the whole system. The details are set forth in the testimony of Mr. Wood, of the receiver's staff, which may be completely relied upon, because of Mr. Wood's knowledge, experience, and scrupulous care in respect of any statement he makes. To take one illustration:

"The emergency wagon service * * * is regulated by the emergency wagon at various points in the system and those wagons respond to calls in certain belts across Manhattan Island, so that no wagon covers all of one franchise or route, but each wagon was free to cover other portions of franchises or routes."

It may well be that under such a system 10 wagons would be sufficient, whereas, if the system were broken up into independent units, 20 wagons would be necessary; for, to illustrate, one wagon might be

sufficient for two lines operated in an unified system, where one wagon each would be necessary if they were independently operated. But, in making an apportionment, it would not be equitable to consider only, as in the case of the cars, the total equipment necessary for the lessors. The distinction is this: In the case of the cars, the fact that there was an unified system made no difference as to the necessary number of cars on the leased lines, except to the extent that there might be a revision of figures as between franchise and operated routes; but, even so, with expert aid, the number of cars can be ascertained with reasonable certainty.

What was done with the cars was to shift them around, but that did not change the number necessary for operation; and for the lessee to keep the cars, just because it failed to mark them for identification, would be, as observed, supra, unjustly to enrich it. But the equipment was not shifted around in any such sense. An emergency wagon might not have been used on a lessor road in a week, and yet used every day of that week on an owned road, or vice versa. The money spent for equipment was as much for the use of the owned lines as for the leased lines, as a necessary incident of economical unified administration, just as a householder might have one entrance light for two houses thrown into one, whereas two lights would be needed for the two houses if separated.

The first step in an apportionment, therefore, will be to ascertain, as of March 20, 1919, the date of taking possession by the receiver, the equipment needed by the owned lines and all the leased lines regarded, respectively, as separate operating units, i. e., the owned lines as one separate unit and the leased lines as each a separate unit. If the total of emergency wagons thus estimated is 100 (say 50 for the owned lines and 50 for the leased lines), and the number to which the 9th Ave. Road is entitled, as of date of return, is 10, and there were but 80 wagons on hand on March 20, 1919, then the 9th Ave. Road will be entitled to eight-tenths, or 8 wagons.

The date of return is fixed because of the provisions of the lease as to termination. March 20, 1919, is fixed as a date not subject to variation. If the equipment thereafter became greater or less, that circumstance should not inure to the benefit of the lessor nor lessee, as the case might be, and March 20, 1919, as in the brokerage cases, is when the property to be apportioned came into the hands of the receiver. It is fully appreciated that this may not be an easy task, but difficulty of apportionment has not deterred the courts from working out approximations which accord substantial equity and justice. Westinghouse Elec. Mfg. Co. v. Wagner Elec. & Mfg. Co., 225 U. S. 604, 32 Sup. Ct. 691, 56 L. Ed. 1222; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U. S. 641, 35 Sup. Ct. 221, 59 L. Ed. 398; Kintner and Barrett v. Atlantic Communication Co., etc., 294 Fed. 136, District Court, Southern District of New York, filed October 14, 1921. Cf. Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676; Pressed Steel Car Co. v. Union Pac. Rd. Co. (D. C.) 254 Fed. 316.

[13] To apportion by mileage percentage would obviously be a false standard. The operating experts must advise in each case upon its own facts. Thus, when considering the 9th Ave. Road, as separately operated on its own franchises, the experts will doubtless inquire into the mileage, the nature of tracks, number and frequency of cars, wear and tear, average of breakdowns, and other details, and, out of their experience, inform the court what the road fairly needed and was entitled to at date of return.

[14] In all that has been said, it will be understood that, if any equipment can be identified as definitely allocated to the 9th Ave. Road, it will not go into the apportionment, but will be delivered to that road. An illustration would be a switch bar, such as referred to in the Belt Line Case, where the court said:

"A switch bar bought with many others for general use, which has been put and kept to use on some switch of the Belt Line, may fairly be considered such a substitute."

The conclusions arrived at under this head do not harmonize with some general language as to equipment used in the Belt Line and Second Avenue Cases. I think the facts in those cases can be distinguished from those in the cases at bar; but, if not, then with the highest respect for the experienced and distinguished court which decided those cases, I must adhere to the theory that an apportionment should be had.

First, the leases in the cases at bar are much more explicit than the Belt Line and Second Avenue leases; secondly, the danger of loss of franchises seems not to have been discussed, nor (although fully appreciated in 157 Fed. 440, 445) the fact that cessation of operation would affect the public interest.

[15] In applying equitable principles to leases of this character, the public interest must be considered as an element in the relations of the parties. If, as in the case of this road, it was unable to operate, because it had no conductors, brakemen, etc., nor many other facilities (American Brake Shoe & Fdry. Co. v. N. Y. Rwys. Co., supra, affirmed June 21, 1922), that was its lookout; but, where the lessee has in its possession property without which the road cannot be operated, and failure to operate will be detrimental to the public as well as to itself, I think the law has been progressing to a point where it is no excuse that the property has been mingled, and where equity demands a just apportionment in kind. Indeed, in the recent decision of the Circuit Court of Appeals in American Brake Shoe & Foundry Co. v. New York Railways Co. (June 21, 1922), Judge Rogers again emphasizes the importance of the public interest and cites Pennsylvania Steel Co. v. New York City Ry. Co. (C. C.) 157 Fed. 440, 445, and 225 Fed. 734, 735, 141 C. C. A. 6.

It is therefore concluded that there should be an apportionment of equipment on the general principles above stated. There are, however, so many different kinds of equipment, so many different uses, and so many different locations that preliminary to a decree, the details must be further worked out as the present record does not present the necessary facts upon which to base a decree on this branch of the case.

[16] *The 8th Ave. Road Lease.*—The elaborate discussion of the 9th Ave. lease renders unnecessary a similar discussion of the 8th Ave.

lease. The language is different in some respects but in essentials is the same. "Revert to and become the property of the lessor without charge or expense," "redeliver and surrender up," and other significant expressions, are also found in this lease.

By this time, however, i. e., November 23, 1895, the Metropolitan Co. had grown to large proportions by merger and consolidation, and it agreed that during the first two years of the lease it would expend at least $1,000,000 on lessor's road in substituting "some other motive power in place of horses." In paragraph tenth, it was provided:

"And the lessor further covenants that the lessee shall have the right to sell or dispose of for its own use without accountability to the lessor all or any of the cars, horses, equipment, rails, track materials and other personal property of the lessor hereby demised upon the substitution, therefor of other property of equal value, or when the lessee shall have expended the sum of one million dollars as hereinbefore provided."

There is no question that more than $1,000,000 was spent to change the motive power. It is contended that when this had happened the lessee was no longer accountable either for the old equipment or the new. What this provision means, however, is that the lessee would have the right to sell or dispose of the old equipment without accounting to lessor, if it substituted other property of equal value or when $1,000,000 was expended. Up to that time, it had no right to sell the old equipment. The clause in question merely marks the time when the old equipment could be sold or disposed of, and must be read with paragraph eighth, which provided:

"All substitutes which may have been made or provided for property impossible to deliver by reason of death or destruction or by being superseded or changed, as above specified, which said substitutes shall be at least equal in value to the property for which they are substituted. And said lessee shall and will at the expiration of this lease by the lapse of time or otherwise, surrender the franchises, rights and privileges aforesaid, and all other property aforesaid unimpaired by any act or default of the said lessee."

There being thus no distinction between this and the 9th Ave. Road, the same principles of apportionment will apply.

C. *Rights of the Mortgagees.*

In 1897, Metropolitan Co. started to electrify its then extensive system and included in the lines to be electrified the 8th and 9th Ave. Roads. On February 1, 1897, Metropolitan Co. made what was known as its general and collateral mortgage with Guaranty Trust Company as trustee to secure the payment of $12,500,000 of bonds for the purpose, principally, of raising money to build, furnish and operate electric lines and to provide equipment therefor. On March 21, 1902, Metropolitan Co. made what was known as its refunding mortgage to Morton Trust Company, as trustee, to secure an authorized issue of $65,000,000 of bonds. In 1907, Metropolitan Co. became insolvent and receivers were appointed by the then Circuit Court of the Southern District of New York.

[17] Both of the mortgages, supra, were then foreclosed. It is contended that what was held in Guaranty Trust Co. v. Metropolitan St. R. R. Co. (C. C.) 166 Fed. 569, at page 573 (affirmed 177 Fed. 925, 101 C. C. A. 205), controls or affects the case at bar. In

the case just cited, the lessors here concerned were not parties, and the court was dealing solely with the rights of the mortgagors and mortgagee, irrespective of the rights, if any, of the lessors. The phrase construed in regard to after-acquired property read, "for use upon or in connection with" the lines enumerated in the mortgage, and the court pointed out that the rolling stock and equipment, "when not used or bought for use exclusively on enumerated lines, were intended for and used on lines operated *in connection* with enumerated lines" (italics mine), and therefore the court held, as between mortgagor and mortgagee, that the mortgage covered the entire personal property (except certain cash) used, employed or intended for use on the system.

The court in that suit did not adjudicate, and could not have adjudicated, the rights of the lessors. In due course, by proceedings which it is unnecessary to set forth, the old Metropolitan system was reorganized, and the N. Y. Rwys. Co. was created. See, for further detail, American Brake & Shoe Fdry. Co. v. New York Rwys. Co. (D. C.) 277 Fed. 261.

[18] That corporation made two mortgages, one to the Guaranty Co., as trustee, and another to Farmers' Co., as trustee. Their provisions are substantially similar, so far as here relevant in regard to leases. Among the properties mortgaged were "leases"; and the 8th and 9th Ave. Roads were dealt with by name in separate paragraphs, and the N. Y. Rwys. Co. in each instance irrevocably elected to adopt and continue the lease. The mortgagees were, in no sense, purchasers for value without notice in respect of these leases. They took these leases as they were with their benefits and their burdens, and with full knowledge of what these leases contained. The mortgagees had no more rights than their mortgagor, and while the mortgages could reach out for after-acquired property, such as rolling stock, materials, and supplies (American Brake Shoe & Fdry. Co. v. New York Rwys. Co., 277 Fed. 261; Pintsch Compressing Co. v. Buffalo Gas Co., C. C. A., Second Circuit, 280 Fed. 830, their after-acquired property clauses could not impair the prior existing rights of the lessors. If, then, the lessors were entitled in respect of cars and equipment to an apportionment, as held supra, no provisions in the mortgages (to which, of course, the lessors were not parties) could affect that or any other right which sprang up under the leases.

It is therefore held that the mortgagees have no lien upon such cars and equipment as may be apportioned to these lessor roads.

D. *Creditors.*

[19] It would be an anomalous result, in view of the American Brake Shoe and Pintsch Cases, supra, if the mortgagees had no lien, but nevertheless the creditors could lay hold of the cars and equipment. The case of Niagara Falls H. P. Co. v. Schermerhorn, 60 Misc. Rep. 209, 111 N. Y. Supp. 576, affirmed 132 App. Div. 442, 117 N. Y. Supp. 10, and affirmed 197 N. Y. 542, 91 N. E. 1118, on the opinions below, is very much in point. True, that case dealt with a real estate lease, but its underlying principles are no different from those in the cases at bar. It was pointed out very fully in the American Brake Shoe Case and in the Pintsch Case, supra, that the materials and supplies of public utility corporations are not regarded as chattels in the ordinary

sense, for the reason particularly that they are needed to enable quasi public corporations to carry out their franchise duties and their obligations to the public. The law relating to chattel mortgages thus becomes irrelevant to cases like those cited and to the similar situation in the cases at bar. No general creditor can reasonably or fairly rely upon the possession of property of this kind when he extends his credit. So far as the general creditor is concerned, such property in the case of a railroad corporation becomes as much fixed and as little a chattel as does the track upon which the cars run, and in that regard such property must be considered in principle the same as the property discussed in Niagara Falls Co. Case, supra. It is therefore held that in the case at bar the rights of the lessors as against the lessee in respect of cars and equipment are not affected by any rights of general creditors, and that the property referred to is not subject to the claims of general creditors as against the lessors.

E. *Extensions and Branches.*

Under this head the following claims are made:

*Ninth Ave. Road.*—(1) The so-called Cortlandt Street loop which runs south of Fulton street from West Broadway to Greenwich, down to Dey, one block west to Washington, and then around that block at Cortlandt Street ferry and up Greenwich street to Fulton street and Greenwich. (2) One block on 125th street, from Amsterdam avenue to Broadway. The claim of ownership to (2), supra, is not contested by the receiver.

*Eighth Ave. Road.*—(1) The second track on Barclay street, between West Broadway and Church street. (2) The track on Barclay street, between West Broadway and Church street. The leases included, not only the existing property including franchises, but also additions, extensions, branches and connections. The following extracts from the two leases are fairly typical of the language used when referring to extensions, etc.:

In the 9th Ave. lease, it was provided that the lease should include, inter alia:

"All extensions, or branches of said railroad, the right for the construction and operation of which may be hereafter acquired in the name of or on behalf of the said party of the first part, and all rights, privileges and franchises of the party of the first part to make connections, extensions of the franchises of the party of the first part to construct, maintain and operate a railroad in the city of New York."

In the 8th Ave. lease, it was provided:

"First. The party of the first part has granted, demised and leased * * * the railroad of the party of the first part in the city of New York heretofore constructed and now in use, or which may hereafter be constructed and put in use, during the term of this lease, * * * and all * * * equipments to said railroad belonging, together with all franchises, rights, powers and privileges for the construction, maintenance, use and operation of the railroad now belonging to the party of the first part, and all and singular any extensions or branches of its railroad aforesaid which the party of the first part now has or may hereafter acquire the right to construct or operate, and all the benefits, privileges and rights arising from or growing out of any and all contracts, leases or agreements between the party of the first part and any other railroad company or corporation whatsoever which the party of the first part now possesses or may hereafter be entitled to receive."

In both leases, appropriate language was used to require the redelivery of extensions, branches, etc., in the event of the termination of the lease. The words, extensions, branches, connections, additions or any other words ejusdem generis are distinguishable from each other in technical railroad language, but, for the purposes of this discussion, these distinctions are of no consequence because all these words are of the same general import intended, by comprehensive language, either to cover the addition of tracks to existing franchise routes of the lessors or to cover new franchises obtained in order to add branches, extensions or connections. But any new franchise necessarily means the franchises of the lessor.

In both leases the lessor agrees to do any and every lawful corporate act which may be necessary to secure to the lessee the full enjoyment, not only of the existing railroad, but of any and all extensions, etc., and the right to construct, maintain and operate any extensions, etc., which the lessee may desire to construct and operate. It needs no discussion to reject the contention that an extension, branch or connection of a lessor road was created or established because the lessee ran cars over franchise routes which either it owned or obtained or which belonged to some other railroad corporation. Plainly, no act of the lessee could affect the rights of some other corporation not a party to the lease.

Without setting forth the somewhat extended history of the so-called extensions or branches claimed by the 8th and 9th Ave. Roads in these litigations, it is enough to say that the record fails to disclose any title in either the 8th or 9th Ave. Road. These roads may have some other rights but before such rights can be determined, all corporations having any interest therein must be joined as parties in an appropriate suit.

For instance, apparently, the legal title to the track on Barclay street, between West Broadway and Church street, is in the Broadway & Seventh Avenue Railroad Company. A continuation of these tracks was acquired by that company and title to the additional tracks has been forfeited. Presumably that forfeiture did not change the title to as much of the track as was not forfeited. The receiver is operating the Broadway & Seventh Avenue franchises, and the track has been used for some of the 8th Ave. cars upon their return from the Battery on the South Ferry franchise. It may be that the 8th Ave. Road could claim the receiver's rights under the Broadway & Seventh Avenue lease, but at present the lease has not been adopted nor is the Broadway & Seventh Avenue Road a party to the pending cause.

In these litigations, only title is being dealt with, and if any other rights are claimed or exist appropriate reservation in respect thereof may be made in the decrees. Even though this opinion is somewhat extended, because of the necessity of quoting from certain portions of the leases, it is vital that the leases be completely and carefully read as affecting the questions as to cars, equipment, extensions and branches.

These questions are important, because of the number of leased lines heretofore and now in the system. In addition to the 8th and 9th Ave. Roads, the New York & Harlem Road has been separated from the system, and the following leased lines remain in and are being operated

in the system: Broadway & Seventh Avenue; Forty-Second Street & Grand Street Ferry; Ft. George & Eleventh Avenue; Twenty-Third Street Railway; Bleecker Street & Fulton Ferry; Thirty-Fourth Street Crosstown; Christopher & Tenth Street; Sixth Avenue. It is important, therefore, that the decrees be carefully drawn, as some or all of the other leases may be governed by the construction given to the leases here considered.

Prior, therefore, to the submission of the decrees, it will be desirable for counsel to confer with each other, and, if necessary, with the court.

## Supplemental Opinion.

I have now signed the decrees herein, and I think it desirable to make a brief statement for the information of the Circuit Court of Appeals. When I filed my opinion of June 28, 1922, I did not know whether there would be enough cars, both for the New York Railways Company and the lessor companies, nor did I know the details of equipment on hand, nor had I before me the evidence upon which I could work out some principle of apportionment in respect of equipment. It then seemed to me that it might be necessary in this case to have something in the nature of an omnibus proceeding. That, however, was found impracticable, because of many reasons of technique.

It now appears from the record in this case that the receiver has in his possession enough cars to satisfy the requirements of all the lessor roads, as well as of the New York Railways Company. Therefore the actual award of the number of cars in this case cannot prejudice the rights of the New York Railways Company, nor any of the lessor companies, nor any of the mortgagees, if the basic principle upon which the award rests is sound. In regard to equipment, there can also be no prejudice, if I am right as to the basic principle, because I have made the award on the basis of car mileage. If I am right in this, then each road will get its percentage of equipment on that basis, which, in the last analysis, is practically a mathematical basis.

I call attention to the foregoing, because it is the desire of all concerned that this important test case shall not be embarrassed by minor questions. It has been my purpose and desire to eliminate minor questions and this I feel has been accomplished, so far as concerns the practical side of the award of cars and equipment. In other words, an omnibus proceeding in this case is no longer necessary.