PENNSYLVANIA STEEL CO. v. NEW YORK CITY RY. CO.    MORTON
TRUST CO. v. METROPOLITAN ST. RY. CO.    GUARANTY
TRUST CO. v. SAME.

(Circuit Court, S. D. New York.    June 29, 1908.)

STREET RAILROADS (§ 58*)—RECEIVERS—ADMINISTRATION OF PROPERTY—ASSUMP-
TION OF LEASES.

Receivers for insolvent street railroad companies operating a system
composed of a number of constituent lines, some of them held under lease,
are not required to continue to operate any such lines at a loss, and where
it appears that the rental is excessive, or the lease is otherwise unprofita-
ble to the estate, they will be directed to cancel the same.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 58.*]

In Equity.    On petition of receivers for instructions.

Byrne & Cutcheon, for Pennsylvania Steel Co.
Masten & Nichols, for receivers of New York City Ry. Co.
Bronson Winthrop, for Morton Trust Co.
Masten & Nichols, for receivers of Metropolitan St. Ry. Co.
Davies, Stone & Auerbach, for Guaranty Trust Co.

LACOMBE, Circuit Judge.    The receivers, upon due notice to all
parties, ask for instructions as to a lease of the Central Park, North
& East River Railroad, commonly known as the "Belt Line," located in
Fifty-Ninth street, and running through Tenth avenue, First avenue,
and other streets and avenues to the South Ferry.    It comprises 7.433
miles of single electric track and 12.3 miles of single horse track.    The
lease was originally made to the Metropolitan Cross-Town Company,
and runs for the unexpired term of the charter, 100 years from June
5, 1860.    The Metropolitan Cross-Town was subsequently consolidat-
ed, with other companies, into the Metropolitan Street Railway Com-
pany, and the leasehold is included with the other property leased from
the latter company by the New York City Railway Company.    The les-
see of the Belt Line agreed to operate the roads, to keep the demised
properties in good condition and repair, to pay all taxes, assessments,
and charges which might be lawfully imposed thereon and to pay a
rental (calculated as equivalent to 9 per cent. on the stock of the lessor
company) which now amounts to $162,000 per annum.

A careful examination of the books shows that for the year ending
March 31, 1908, the total gross earnings (cash fares) amounted to
$729,846.05, which some other items of income, such as advertising,
rental of electric track, etc., increased to $749,624.64.    The total op-
erating expenses aggregated $607,896.20; besides which there was paid
for taxes, other than special franchise, $26,302.90, and for rent of
necessary equipment $16,000—making the total disbursements $650,-
199.10.    The special franchise tax was not paid, its amount being in
litigation; it was assessed for the year 1907 at $47,090.68, and, in the
event of a successful termination of the litigation, would be at best
only somewhat reduced; the reduced amount would have to be includ-

ed in the disbursements. Opposing counsel criticise these figures, and argue that the operation of the road is profitable, submitting expert reports and estimates; but the court places greater reliance on the results of the observations of its receivers, who for nine months have been in actual operation of the road, making a careful study of all its conditions. Irrespective of the franchise tax, it appears that the net earnings of the leasehold amount to $99,425.54 only, while the rent agreed to be paid is $162,000, a net annual loss of over $60,000. Moreover, it may be necessary in the near future to incur heavy expenses for construction, and, when the correct amount of unpaid franchise taxes is determined by the state courts, that also will have to be paid as a prerequisite to the future enjoyment of the franchise.

Under these circumstances, by payment of the stipulated rental to the lessor company, the receiver would evidently be "serving the stockholders," as the chairman of the Public Service Commission aptly expresses it. Whether the rental was excessive when originally agreed to is of no moment. It was stipulated for 16 years ago, at a time when conditions were such that the Belt Line, operated entirely by horse power, issuing practically no transfers and assessed for no franchise tax, earned 10 per cent. on its capital stock over and above all operating expenses and fixed charges. But under the conditions of to-day the rental is surely excessive for the lessees to pay, and it is with existing conditions only that we are now concerned. Great changes like this, ghastly sometimes in their results to innocent individuals, are contingencies to which all investments in public service corporations are peculiarly exposed. Nor is it at all material to inquire whether the rental is high because of the presence of "water" in the capitalization of the lessor company. Neither its stock nor its bonds have been increased since the time, 16 years ago, when it was a very profitable property, and in the interim 7 miles of its roadway has been transformed from horse car tracks to conduit electric system, wholly at the expense of the lessee; not a dollar of the cost has been repaid by the Belt Line to the lessee by issue of additional stock or bonds, nor, so far as the receivers can discover, even by the giving of notes, as was done in the case of other lines. But even if there were "water" in the capitalization, certainly the receivers of the New York City Railway Company have no power to pump it out, nor indeed has this court; that is a matter which must be left for the consideration of state authorities and state courts.

Inasmuch as it is not "the first object of the receivers to pay excessive rentals to leased lines," the manifest thing to do is promptly to terminate the existing situation, and relieve the property which they are operating from the burden of this unprofitable contract. If the lessor should thereafter offer the property on more favorable terms as to rental, and also as to provision for such construction expenses as might be required to render the property more efficient for service, such proposition may be then considered. The important thing now is to relieve the whole system of the constant drain upon it, entailed by the continuance of the present lease; $60,000 a year might be much better expended in improving the condition and service of the remaining lines.

It will be readily understood that there may be leases which it would be desirable to continue, even at some small loss, because part of the roads covered by them are essential to make connections between different parts of the system. But this is no such case. If the line known as "First and Sixth Avenues" between the shopping district and upper East Side should have to be discontinued, passengers can be carried for a single fare between those districts by the use of the Second avenue road and the Eighth street, Fourteenth street, Twenty-Third street, and Thirty-Fourth street cross-town lines. The two upper West Side lines, "Columbus Avenue and Broadway" and "Amsterdam and Sixth Avenue," can run their cars east and west through Fifty-Third street instead of Fifty-Ninth street. Nor is there any serious difficulty to be apprehended in the operation of the Prince and Houston street and other lines without the use of any part of the Belt Line tracks in excess of the statutory thousand feet.

The receivers are therefore instructed that the lease may be canceled, the leasehold (including not only the real estate, but also all personal property which can be identified) returned to the lessor, and its further operation by these receivers discontinued. It would be desirable if this could be done by June 30th, which ends the fiscal and railroad year; but a proper regard for the convenience of the traveling public precludes so speedy a disposition of the matter. There is an existing board of directors of the Belt Company to whom the property might be returned, but they were originally elected when the lessee was in entire control, and a stockholders' meeting has been called for July 10th to elect a new board which will represent solely the interests of the lessor. Common fairness requires that the company should not be called upon to act until its stockholders shall have the opportunity to select a board solicitous to protect their interests. If they choose not to avail of their opportunity or to elect a new board, there will then be no objection to the receivers dealing with the old board. Manifestly it will take some little time for the management of the road to equip it and to organize an operating force, and in order that there may be no falling off in the service during the interim the receivers are authorized to make contracts with the company for temporary operation, or for the rental of cars, or power, etc., provided that such contracts are upon such terms as not to expose receivers to loss; and provided further that liability for accidents of operation or for loss from fire or other catastrophe shall rest only upon the owner, and that the cost of necessary work of construction or reconstruction shall not be imposed upon receivers. Care should also be exercised to reserve the right to cancel any such contracts on reasonable notice should the requirements of public service on other parts of the City Railway System make it necessary to withdraw cars, power, etc., from the service of this independent line.

As to transfers. After the lease is canceled and the road returned to owners. the transfer act of 1885 (Laws 1885, p. 525, c. 305) will no longer apply. It is thought that mere temporary operation as agents of owners would not constitute the sort of agreement contemplated by that act. Nevertheless it seems unnecessary to invite controversy on a

point which may be in doubt, and until the actual operation is taken over by the lessor, and one week's notice shall have been posted in the cars, the exchange of transfers will be continued.