PENNSYLVANIA STEEL CO. v. NEW YORK CITY RY. CO. MORTON TRUST CO. v. METROPOLITAN ST. RY. CO. GUARANTY TRUST CO. v. SAME.

(Circuit Court, S. D. New York. October 19, 1908.)

1. STREET RAILROADS (§ 58*)—LEASES—CANCELLATION BY RECEIVERS OF LESSEE —RESTORATION OF PROPERTY.

Petitioner leased its street railroad line for a long term, the lease providing that the lessee should maintain the property, and whenever the lease should cease to be operative should return all horses, cars, etc., leased to and used by it in good condition, and as to any which should have ceased to exist should return the substitutes provided therefor to an equal value. The lessee united the line with others owned and leased by it, operating the whole as a single system and using the equipment indiscriminately on all the lines. After the lapse of 16 years the property was returned to the lessor by receivers appointed in suits against the lessee. *Held*, that such property as could be identified as having been received under the lease or as having been substituted therefor should be returned, and that horses, cars, or other equipment of the same kind as that received under the lease, exclusively in use on the line at the time of the appointment of the receivers, might be assumed to be substitutes, and that as to any shortage petitioner had its claim for damages against the lessee.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 58.*]

2. STREET RAILROADS (§ 58*) — LEASES—CANCELLATION BY RECEIVERS FOR LESSEE—RESTORATION OF PROPERTY.

A considerable part of such leased line was converted by the lessee at its own expense from a horse to an electric line at a large cost, and different cars were placed thereon. *Held*, that such electric cars could not be considered substitutes for the horse cars which they replaced and which were transferred to other parts of the lessee's system, and that petitioner was not entitled to the same.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 58.*]

3. STREET RAILROADS (§ 58*) — LEASES—CANCELLATION BY RECEIVERS FOR LESSEE—ACCOUNTING FOR EARNING.

Where receivers appointed for a lessee of a street railroad system continued to operate one of the leased lines after the time for which rent was paid, but within a reasonable time elected not to continue the lease and returned the property to the lessor, they should account to it for the net receipts of such operation for the time during which no rent was paid.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 58.*]

4. STREET RAILROADS (§ 58*) — LEASES—CANCELLATION BY RECEIVERS FOR LESSEE—RESTORATION OF PROPERTY.

At the time of the leasing of a street railroad line for a long term, the cash then in the treasury of the lessor was paid over to the lessee as owner and not as lessee; the lease providing, however, that, if the lessor should resume possession of the property by reason of default, the money should be deemed a loan, and returned with the other property. Subsequently receivers for the lessee elected to cancel the lease, and returned the property. *Held*, that they were not required to return the money which did not come into their possession, but that the lessor could prove

its claim for the amount against the property of the lessee being administered by the court.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 58.*]

In Equity. On petition of Central Park, North & East River Railroad Company, known also as the Belt Line.

See, also, 161 Fed. 784, 786, 787.

Byrne & Cutcheon, for Pennsylvania Steel Co.

Dexter Osborn & Flemming, for receiver of New York City Ry.

Bronson Winthrop, for Morton Trust Co.

Davies, Stone & Auerbach, for Guaranty Trust Co.

Masten & Nichols, for receivers of Metropolitan Street Ry. Co.

LACOMBE, Circuit Judge. Reference may be had to the opinion filed June 29, 1908 (165 Fed. 459), for a statement of the circumstances under which payment of rent to the petitioner road ceased and the road itself was returned to its owners. Such return was made August 7, 1908. The present application is for instructions (1) that the "personal property of petitioner heretofore used and operated by receivers of the New York City and Metropolitan under the lease of October 14, 1892, should be delivered to petitioner"; (2) "for the payment of accrued rental under said lease"; and (3) for the "return to petitioner of the cash turned over to the lessee company under said lease at the time of making thereof to the amount of $108,618."

The former instructions directed receivers to return to petitioner not only the real estate, but also "all personal property which can be identified." It is understood that this has been done as to all personal property which can be identified as having come from the lessor to the lessee. If it be contended that there are any such items which have not been returned, petitioner can make proof of them before the special master, and the former instructions will thereupon be carried out.

It should also be noted that what is now presented for consideration is not at all a claim against the lessee company (Metropolitan) or the sublessee (New York City) for property converted or allowed to go to waste and destruction contrary to the covenants of the lease. Any such claim against either or both companies may be filed with the master, and, when proved, will share with other claims of equal rank in whatever assets may be ultimately marshaled for distribution. What we have here is a demand that the receivers turn over certain specific things now in their custody, and it cannot be complied with if no such specific things have in fact come into their possession. The property specified is described generally as about 40 electric cars, with all the equipments and appurtenances thereof, 100 horse cars and 700 horses, with the necessary harnesses, tools, implements, equipments, stable equipments, furniture and fixtures.

The lease contains the following clauses:

"[The lessee covenants that it] at all times during the continuance of this lease will maintain, manage, use and operate and keep in good and working condition and repair, at its own expense, the entire line of the said demised railroads

or railroads and all extensions and branches thereof which are now or may hereafter be constructed, and all fixtures and appurtenances that now are, or hereafter may be constructed; and also keep the personalty hereby demised in good working order, condition and repair, so that the traffic and business of said railroad shall be encouraged and developed and reasonable accommodation given to the public * * * and will deliver up the said railroad or railroads and all the buildings, fixtures and appurtenances thereof at the expiration of this lease, or whenever the same shall become inoperative in good order and repair. * * * And * * * will replace any part of the demised property which may be destroyed by fire or other cause."

"[The lessee also covenants that it] will at the termination of this lease or when for any cause it may cease to be operative, transfer, deliver and return to the party of the first part in good condition the horses, harnesses, cars, tools, implements, machinery, equipments, stable equipments, office furniture and fixtures and all property of every kind leased to and used by the party of the second part in the maintenance and operation of the railroad aforesaid, except that which is hereby absolutely transferred or which has passed from existence by death or destruction, and shall also deliver the substitutes, increments and additions provided or made by the party of the second part; and the substitutes for the property impossible to deliver by death or destruction shall be equal in value to that for which they are substituted."

This lease was for a very long term, as were many others under which the lessee, which itself owned several roads, built up what was known as the "Metropolitan Street Railway System," including all the lines on Manhattan Island. Such long terms gave an apparent asurance of permanence as a unitary structure, and it is not surprising to find that during its operation new cars and horses were bought for general use, being run now on one line, now on another, while cars of different roads were run indiscriminately throughout the system, and to a very large extent the identity of cars which had been acquired under lease from different roads and were from time to time repaired and repainted was destroyed. In the 16 years which have elapsed since the lease now under consideration was made, all the horses owned by the Belt Line have died, and although it is probable that some of its cars have not yet reached the scrap heap, no one can now identify them. To the extent that the lessee's failure to keep the original items of property, or substituted items, in proper condition to return, was a breach of covenant, petitioner has its claim for damages against the lessee or sublessee. The question here presented, however, is a different one, namely, whether under the facts which are conceded or can be proved there are now in the possession of receivers horse cars and horses which can be identified as the "substitutes" which the lease provided for. Manifestly if it were the fact that when original car No. 17, Belt Line, went to the scrap heap, a new car similarly numbered was put in its place, and when horse No. 312, Belt Line, died, a new one was bought and entered in the records as a substitute, these substitutes should be returned in place of the originals. It would seem that by placing on the line horse cars and horses which cannot be identified as belonging to some other lessor the same result was practically accomplished, and receivers may properly assume that the horse cars and horses (and harness) which they found in use by the New York City Railway on the Belt Line when they took possession are "substitutes" to be returned to the lessor when the road itself is returned. If the "substitutes" are less

in number or of inferior character, or in an unfit condition of repair, that circumstance might support a claim against the lessee; all the receivers can be required to do is to return the specific thing. Unless some agreement can be arrived at, the special master will take proof as to what horse cars, horses, etc., were actually in use as "substitutes" on the Belt Line on September 25, 1907, and these the receivers will return. Should any new questions develop on this branch of the case when proofs are taken, they may be disposed of upon hearing on the master's report.

As to part of the petitioner's road, a different question is presented. Some years after the lease became operative the lessee decided to change the horse car tracks through Fifty-Ninth street, and for four blocks down Tenth avenue, to an electric conduit. This was a very expensive operation, costing considerably more than $1,000,000. The case differs from that of the Second avenue road, which was argued at the same time, in this: that no part of the construction nor any part of the cost of equipment was paid for by the lessor. The lessee built the new track, put in the power cables and all equipments, and, when finished, used upon it electric cars which it had bought for general use on its system. It received from the lessor neither bonds, stock, nor even notes for any part of this improvement, which greatly enhanced the value of the property. Whether there was any charge made for it, or any assent to the propriety of such charge on the part of the lessor, does not appear. If there were, the facts can be shown before the master, and possibly further questions will arise for determination. Under these circumstances petitioner asks that the electric cars now operated on that part of the road be turned over. The application is denied. The improvements which have been made on the line itself are of course permanent; they cannot properly be removed; the road goes back to owners in its improved condition. If the effect of such improvements had been to destroy or impair its usefulness as a horse car line, the situation would be different; but it is understood that is not so. After the change the original cars of the Belt Line could be run over the new track; had they been kept in perfect condition by the lessee and returned on termination of the lease, the lessor would have had all it was entitled to. The fact that the lessee, instead of thus preserving them, used them on other lines, wore them out, and let them go to waste without providing others in their place, may justify a claim for damages against lessee and sublessee, but seems not to warrant a finding that on September 25, 1907, these electric cars were their designated substitutes.

As to tools and equipment generally, the case must go to the special master to determine the facts; these general propositions governing his investigation. Tools and equipments in use on the Belt Line were received by lessee, and presumably have been worn out and cannot be identified. If the lessee has failed to keep that line provided with substitute tools and equipments, a claim for consequent damage may be proved against it. If it can be shown that when receivers took possession there were any tools and equipments which, by exclusive use on the Belt Line, had been supplied to it as substitutes,

receivers should turn them over. If such were used indiscriminately on several lines, they cannot be held to have been designated as substitutes for original Belt Line tools and equipments. Thus the tools used by a repair gang for making repairs on a division of the whole system which includes parts of the Belt Line and parts of the Sixth, Seventh, and Eighth Avenue Lines will not be such "substitutes," while a switch bar, bought with many others for general use, which has been put and kept to use on some switch of the Belt Line, may fairly be considered such a "substitute."

All questions as to office furniture and fixtures will be disposed of when the master's report is presented.

There has been no unreasonable delay on the part of receivers in examining into the question of the propriety of accepting or rejecting this lease. The whole system is most intricate, and the method of keeping accounts made it difficult to distribute receipts and expenses between the different routes. The case is within the principles enunciated in Quincy R. R. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787, 36 L. Ed. 632, but receivers (New York City and Metropolitan) should account for whatever receipts came into their hands from the operation of lessor's road during the period for which no rent has been paid, deducting whatever is properly chargeable against the same. This, of course, is a matter to be taken up in the first instance before the master. The petitioner may renew its application to be paid a sum equivalent to rent for the period, before the master, so that all the questions may be disposed of at the same time, and petitioner not required to review them piecemeal, should it wish to appeal.

As to the claim for the $108,618 cash turned over to the lessee company at the time of making the lease, that instrument contains the following clauses:

"It is further understood and agreed that the party of the second part receives the cash in the treasury of the party of the first part at the time of the taking effect of this lease as owner and not as lessee thereof, subject, however to this reservation and condition, viz.:

"That if the party of the first part shall resume possession of the demised property on account of any default of the party of the second part, then the said money shall be deemed to have been a loan instead of an absolute transfer, and shall be returned by the party of the second part to the party of the first part, with the remainder of the property of which the party of the first part takes possession."

It seems entirely clear that under this covenant the lessor has a claim against the lessee for money loaned, but neither the original $108,618, nor any like sum earmarked as the lessor's property, has ever come into the possession of receivers, and the application to instruct them to pay such sum to petitioner is denied.