In re PHILADELPHIA RAPID TRANSIT CO.

No. 18204.

District Court, E. D. Pennsylvania.

Nov. 6, 1936.

942

See, also, 11 F.Supp. 865.

Frederic L. Ballard and Allen Hunter White, both of Philadelphia, Pa., for trustees and debtor.

Joseph Gilfillan and John J. Sullivan, both of Philadelphia, Pa., for Union Traction Co.

W. W. Montgomery, Jr., and Ulric J. Mengert, both of Philadelphia, Pa., for Class A underliers.

Francis B. Bracken and John Russell, Jr., both of Philadelphia, Pa., for Class B underliers.

William E. Mikell, Jr., of Philadelphia, Pa., for Electric Traction Co. and Peoples Traction Co.

Joseph Sharfsin, of Philadelphia, Pa., for City of Philadelphia.

Louis E. Levinthal and Felice E. Darkow, both of Philadelphia, Pa., for Public Service Commission.

Morris Klewans, of Philadelphia, Pa., for various stockholders.

WELSH, District Judge.

This is a claim by the Union Traction Company against the Philadelphia Rapid Transit Company, hereinafter called P. R. T., for use and occupation under lease of the street railway system of Philadelphia, excluding the city-owned Broad Street Subway and Frankford Elevated. We referred the claim to a special master for consideration and recommendation, and he has recommended a payment of $3,500,000.

Exceptions to the special master's recommendation have been filed by the P. R. T., by the trustees of the P. R. T., by the city of Philadelphia, and by the Public Service Commission of Pennsylvania.

The claim was filed by the Union Traction Company in a dual capacity, (1) as owner and lessor in its own right of a part of the street railway system of Philadelphia, and (2) as lessee of other underlying companies claiming ownership of the remaining parts of the system. It was an additional finding of the special master that present ownership of the entire transit system of Philadelphia is in the Union Traction Company and its allied underliers. The exceptions filed challenge this additional finding of the special master also.

We consider first the finding of the special master awarding present ownership of the City's entire transit system, to the Union Traction Company and its allied underliers. The claim of the Union Traction Company for use and occupation of the entire transit system obviously depends upon the correctness of this award of ownership.

■ The starting point on the question of ownership is an agreement of July 1, 1902, entered into between the Union Traction Company and the P. R. T., and at the outset the very integrity of that agreement is questioned by some of the exceptions filed. Among other things, proofs have been offered that in the execution and ratification of the agreement a majority of five out of eight of the directors of P. R. T., present and voting, were at the same time interlocking directors and stockholders of the Union Traction Company, and it is urged that, while this circumstance may not be of itself affirmative evidence of fraud, any agreement shown to have been the product of the action of interlocking directorates should be scrupulously scrutinized by the court. We entirely agree with this contention, and with the further statement of counsel as to the difficulty of proving actual fraud after the lapse of 34 years and the passing away of the actors to the agreement. We pass, therefore, to a careful scrutiny of the agreement of July 1, 1902.

■ The agreement, by its terms, demises to the P. R. T. all the right, title, and interest

in and to "a first-class street railway system, covering the various lines of street railway now operated by Union, with all proper and necessary railways and appliances, power houses, storage battery plants, buildings, repair shops, electrical machinery and devices, poles, wires, overhead and underground conduits, cars, motors, tools, implements and equipment." Section 21. The demise is upon a rental basis, and the term of the lease is 999 years, subject to earlier termination for defaults under the lease. On termination of the lease, the P. R. T. is to deliver to the Union Traction Company "all the property and premises *hereby demised,* in the same good order and condition in which they now are, with the streets upon which the various lines of railway are laid, paved and in the same good condition as they now are." Section 21.

We shall say but little of a 999-year lease of a street railway system which requires the delivery of the property at the end of 999 years, *in the same good order and condition as when leased.* Such a lease may or may not be a fiction resting on a false analogy, and unfounded in logic or reason. We simply say that the lease, as thus far examined, on its face imports full ownership of the *demised property* in the Union Traction Company, and an unquestioned acquiescence by the P. R. T. in that ownership.

But there are further terms to the lease. The P. R. T. was to make repairs, renewals, and replacements to the demised property; and it also was to make "improvements and extensions" thereto, to the end that there should be delivered to the Union Traction Company, upon the termination of the lease, "the entire system and all parts thereof and everything pertaining thereto including all extensions, fully equipped in a thoroughly first-class manner in all respects, with all improvements which may be then in general use on similar first-class railway systems of like extent." We particularly note that the "extensions" were to be made not only upon the streets in which the Union Traction Company was under lease obligations of its own to construct additional lines; they were also to be made to railway and traction systems "besides those herein demised." Section 18.

It appears to be undisputed that, notwithstanding the long interval since the execution of the lease, some of the original demised property is still extant, and we do not understand it to be questioned that owner-ship of such extant property is in the Union Traction Company and its allied underliers.

The special master's finding, however, is that not only is such extant property the property of the underliers, but that title to all the "improvements and extensions" made to the demised property during the last 34 years vested in the Union Traction Company and its allied underliers at the time of the installation of the improvements and extensions, and has remained so to the present time.

As we have said, such a finding is essential to the maintenance of the large use and occupation claim before us. The claim is expressly predicated upon the ownership derived under the lease which we have been examining. The brief of counsel for the Union Traction Company distinctly informs us that "the money is claimed by Union from P. R. T. under the lease of 1902." No default under that lease is at present being pressed. The lease continues in unchallenged full force and effect. As the learned special master well points out, the whole theory of the P. R. T.'s pending reorganization proceeding under section 77B, Bankr.Act (11 U.S.C.A. § 207) hangs upon a continuance of the lease of 1902, and counsel for the Union Traction Company at the hearing before us on October 7, speaking of the long delay in submitting a plan of reorganization which would enable the Court to proceed with its duties expeditiously, said: "I am going to work on it now, and I think in the course of a week we can present something to you."

We are unable to approve and adopt the special master's finding that title to the "improvements and extensions," vested in the Union Traction Company and its allied underliers at the time of the installation of the improvements and extensions, and has remained so to the present time.

We find in the lease of 1902 that upon the termination of the agreement the Union Traction Company is to have the right to reject any improvement made to the demised property which it may deem unsuitable or unadaptable to its purposes at that time, with the further right to demand from the P. R. T. such sum of money as will enable it to equip the property as it may think it ought to be equipped, at that time. Section 21. We fail to see how the Union Traction Company could be the owner of the improvements at the time of the installation and at all times thereafter, and yet be in position

944

to reject its own property upon the termination of the lease.

Likewise as to the "extensions." We have seen that the extensions were to be made, not only to the demised system, but also to systems "besides those herein demised." The extensions were to consist of new lines constructed. The new lines constructed were to be leased out by the P. R. T. upon a fair and reasonable rental. Upon the termination of the 1902 lease, the P. R. T. is to assign the leases of the newly constructed lines to the Union Traction Company, and failing to do so, is to be liable in damages. Section 18. We fail to see in this any support for the proposition that the Union Traction Company has presently existing ownership in such extensions. On the contrary, the provision that the P. R. T. is to make an assignment of its leases upon the termination of the 1902 agreement is the very negation of that proposition. An assignment of something in which the *assignor* has no property interest would be but a meaningless gesture.

But there is more. Upon the termination of the 1902 lease, the P. R. T. is to be paid for all its expenditures "in extending or enlarging the system of Union, or any of the lines of railway of the Companies now owned, leased, operated or controlled by Union." Section 11. According to the report of the learned special master: "Since the execution of the 1902 agreement, enormous sums of the Debtor's money have been expended by it upon the property leased thereunder * * * It appears from the record that the Debtor has poured into the system the sum of $72,316,280.82. * * *"

The brief of counsel for the debtor, handed up to us at the hearing on October 7, informs us that, of the above $72,316,280.82, the expenditures for "improvements, extensions and additions" alone amounted to the sum of $45,413,313.86. We are unable to understand upon what theory the Union Traction Company, acting for itself and its allied underliers, would ever have agreed (section 11, supra) to pay P. R. T. for all its expenditures in extending and enlarging the transit system unless the final transaction of the parties, upon the termination of the lease, was to be in the nature of a purchase from the P. R. T. of the extensions and enlargements. Confirmation of this view is found in the further provision of the 1902 agreement, that upon termination of the agreement "all the estate and interest" of the P. R. T. in the demised premises with all its additions and improvements, "shall absolutely cease and determine." Section 28.

What is "all the estate and interest" of the P. R. T., which, upon the termination of the 1902 agreement, is thus to "absolutely cease and determine"? We will quote the exact words of the lease, as follows (italics ours):

"Now this indenture witnesseth, that for and in consideration of the covenants and agreements of Rapid Transit hereinafter contained, and of the sum of one dollar ($1) by it in hand paid to Union, the receipts whereof is hereby acknowledged, Union doth hereby let and demise to Rapid Transit, its successors and assigns, all *its right, title, and interest* in and to the railroads, property, and *franchises* of the various railway and traction motor companies hereinbefore specified, of whose respective railroads, properties, and franchises it is the lessee or the operator, as the same are held and possessed by it under the above-recited leases, contracts, agreements, and assignments; also all its rights, privileges, and franchises derived from or under the above-recited leases, contracts, agreements and assignments; also all contracts for operating railways and use of track to it belonging; also all its real estate and railways as the same are now located and constructed, or as the same may be hereafter located and constructed in pursuance of any and every lawful authority now existing, or which may hereafter exist; together with all the branches, *extensions,* sidings, turnouts, tracks, right of way, lands, machinery, fixtures, depots, stables, shops, wires, motors, power houses, electrical plants, appurtenances, tenements and hereditaments of whatever kind or description and wherever situate, now held, owned, used or controlled by Union, and also which at any time hereafter, during the term of this demise, may be by it held, owned, used, or acquired * * *; also all the electrical apparatus, horses, machinery, cars and other rolling stock, tools, implements, machines, harness, equipments, stable furniture, and such other like personal property generally of every kind or description belonging to or controlled by Union, and in use or intended and adapted for use on, in, or about the premises demised for the business thereof; also all the stock, bonds, and securities to Union belonging, to be held in the manner hereinafter set forth; also all the rights, powers, *franchises* and privileges which now, or at any time hereafter during the aforesaid

term, may be lawfully exercised or enjoyed in or about the use, management, maintenance, renewal, extension, or improvement of the railways and appurtenances above demised; * * * also all the right of Union to enter into contracts by lease or otherwise; also all the executory contracts of Union for construction and for the supply to it of materials, machinery, engines, boilers, cars, rails, power houses, and for the protection and improvement of its property, rights, and business; also all the property, rights, privileges and *franchises* of Union; saving and excepting out of this lease and contract all books and papers relating to the corporate existence, business and accounts of Union: There is further excepted out of this grant, all the interest of the People's Passenger Railway Company, the People's Traction Company, and Union in, to and under a certain lease of the Green and Coates Street Philadelphia Passenger Railway Company to the People's Passenger Railway Company, which lease is referred to in Exhibit C hereof and set out in full as Exhibit One thereof; and also all the interest of the Philadelphia Traction Company and Union in, to and under a certain lease of the Ridge Avenue Passenger Railway Company to the Philadelphia Traction Company, which lease is referred to in Exhibit A hereof, and set out in full as Lease 17 thereof. Each of said leases is by its terms not assignable without the written consent of the lessor. Such consent, however, having been given, in each instance the interest of the lessee has been duly vested in Union. Until further consent is procured for the assignment of such interest by Union to Rapid Transit, Union shall continue to operate said properties, but shall pay over to Rapid Transit a sum equal to the net receipts and profits arising from such operation; and in case and whenever consent is hereafter secured for the assignment of either of said leases to Rapid Transit, then the exception herein made shall fall, and the said interest shall be included in this lease, and subject to all its terms and conditions in the same manner and to the same extent as if this exception had not been made. And provided further, that nothing herein contained shall be deemed or taken in any manner to affect the right of corporate existence of Union, or its powers or franchises, the existence or exercise of which may, from time to time, be necessary to fully carry out the provisions and intent of this lease, and to protect the interest of its stockholders hereunder."

But there is still more. On December 31, 1932, the parties entered into a further agreement. This agreement recites that the P. R. T. has asked for and been granted an abatement of rent under the lease of July 1, 1902, and that in consideration thereof the Union Traction Company has required from P. R. T. a detailed schedule of "the extensions, additions and enlargements" made to the demised property. The agreement recites that the schedule was desired "in order that the Union may have proper further assurance of the *rights* which will accrue to it *upon the termination of the lease, in and to the said extensions, additions and substitutions.*" Accordingly, the P. R. T. furnished the required schedule, and it is incorporated in the 1932 agreement, which contains the further interesting recital that: "It is intended by means of this agreement * * * not to diminish the present *rights* of Rapid Transit or its subsidiaries in such property, facilities and franchises, whether listed in the above Schedule or otherwise, *pending any termination of the aforesaid lease (of July 1, 1902)."*

We regard this agreement of December 31, 1932, as further confirmation of the views we have already expressed.

█ There remain two other agreements. The learned special master, under objection, admitted them as relevant to the issue before him, and held that, taken in connection with the lease of July 1, 1902, they established present ownership in the Union Traction Company to all "renewals, replacements and extensions installed upon the premises demised." Even if the issue be broadened to include these two agreements, nevertheless we find nothing in them which supports the finding of present ownership in the Union Traction Company.

The first of the two agreements is the agreement of December 14, 1908. It recites that, the Union Traction Company having given its consent that certain of its collateral held by the P. R. T. might be used by the P. R. T. in floating a $5,000,000 bond issue, the P. R. T. in consideration thereof pledged to the Union Traction Company all its stock in the Market Street Elevated— all the right, title, and interest of the P. R. T. in that company, as well as all the profits resulting from the operations of that company, to remain, nevertheless, in the P. R. T. subject only to be divested in favor of the Union Traction Company in the event of the P. R. T. default in its bond issue, to the

jeopardy of the Union Traction Company's collateral held by the P. R. T.

Of a kindred nature was the second agreement of March 1, 1912, by the terms of which, in consideration of the Union Traction Company guaranteeing a $10,000,000 issue of bonds by the P. R. T., the latter assigned to the Union Traction Company, "absolutely, finally, unconditionally and forever," all its stock holdings and all its right, title, and interest in the Market Street Elevated,—all the stock holdings and all the right, title, and interest thus assigned to remain, nevertheless, in the P. R. T., "without the payment of any further rental," precisely "as if they had belonged to and been a part of Union's system leased to Rapid Transit on July 1, 1902."

We may admire the dexterity and art exhibited in these agreements, but we cannot sanction the theory that they convey such present title to the Market Street Elevated as authorized the Union Traction Company to include that property in its claim for use and occupation. All that we find in the 1908 agreement is a pledge, to be transmuted into ownership in the event of a default by the P. R. T. on its $5,000,000 bond issue, and all that we find in the 1912 agreement is an assignment, to be free of rental. The skillful manipulation by which the Union Traction Company automatically relegates back and impinges the Market Street Elevated upon the lease of 1902 does not commend itself to us, but, taking the legerdemain at whatever face value it has, certainly no assignment was at all necessary, if the Market Street Elevated was already the property of the Union Traction Company by automatic operation of the lease of 1902.

■ We think it a well-settled principle that every lease which contains covenants in derogation of the lessee's ordinary rights to the improvements, additions, and extensions placed by him upon the demised premises is to be most strongly construed against the lessor, particularly where, as in the case before us, the improvements, additions, and extensions were made with the moneys of the lessee, and the lease makes distinct provision that the lessor will make proper compensation for the improvements, additions, and extensions, upon surrender of the demised premises. Belt Line Case (Pennsylvania Steel Co. v. New York City Ry. Co.) (C.C.) 165 F. 472. For an application of this principle, even where no compensation was to be paid for the improvements, additions, and extensions, see the decision of our own

Circuit Court of Appeals in Montello Brick Co. v. Trexler, 167 F. 482 (C.C.A.3). In the case before us, the moneys of the lessee, i. e., of its stockholders, spent for *improvements, additions* and *extensions* amounted, as we have seen, to the vast sum of $45,-413,313.86. In addition, it is in evidence that $15,503,668.52 was expended on the Market Street Elevated-Subway, $6,553,628.33 on new real estate for railway operations, $3,989,296.12 as advanced to lessors, and $856,373.99 on new cross-town lines, totaling, as the learned special master reports, "the enormous sum of $72,316,280.82 poured into the system by the P. R. T."

We regard the case of American Brake Shoe & Foundry Company v. New York Railways Company (D.C.) 293 F. 612, 619, 633, as inapplicable on its facts, and as furnishing no support for the contention that the Union Traction Company acquired ownership of the improvements and extensions immediately upon their installation. In the American Brake Shoe Case, a 99-year lease of a horsecar line had become terminated at an earlier date by defaults of the lessee, and the lessor had made entry upon the demised premises, but, finding that the lessee had abandoned horse traction and substituted electrical propulsion for the cars, the lessor brought suit to recover certain equipment not already delivered to him. By the terms of the lease, such change of motive power was to be made wholly at the expense of the lessee, and the car line as thus altered was, at the end or sooner termination of the lease, to "revert" to and become the property of the lessor, without further charge or expense to the lessor. In holding that the lessor acquired title to all equipment immediately on its acquisition by the lessee (because property could only "revert" if the revertee had title), the court was at pains to refer to its other decision in the Belt Line Case, cited by us, supra. The court said: "In the Belt Line Case, the situation was quite different. * * * In that lease, it was provided that, whenever it should be deemed by the lessee expedient to change the motive power * * * then upon the lessee's request the lessor should * * * deliver to the lessee negotiable bonds of the lessor for the expense of such change."

Moreover, the court said that the conclusion reached in the Belt Line Case "was justified by the facts of the case, because the lease did not contemplate that the change in motive power should be made at the ex-

pense of the lessee, but, on the contrary, affirmatively required that the lessor, if requested, should issue the necessary bonds for the expense."

So, in the case before us. Unlike the American Brake Shoe Case, the facts here are identical with those in the Belt Line Case, in that the lease here, as there, affirmatively required that the lessor, upon the termination of the lease, pay for all the expenditures made by the lessee in extending and enlarging the demised transit system. Here, unlike the American Brake Shoe Case, there has been no termination of the lease. The lessor has not yet made entry. The lease is still in full operation, and upon its termination, then, and then only, is "all the estate and interest" of the lessee to "absolutely cease and determine." We merely add that the American Brake Shoe Case, on its law, can hardly be reconciled with Montello Brick Company decided by our own Circuit Court of Appeals, and already cited by us and regarded by us as of binding authority.

We are sitting as a chancellor. The claim for use and occupation is pendente lite the 77B proceedings in progress before us, and the jurisdiction of the court in 77B proceedings, although primarily administrative, is distinctly equitable. In re Sterba, 74 F.(2d) 413 (C.C.A.7). The exclusive jurisdiction of the court over the debtor and its property is the same as the court would have if it had appointed a receiver in equity to take possession. In re Nineteenth & Walnut Streets Corp. (D.C.) 9 F.Supp. 625; Continental, etc., Company v. Nineteenth & Walnut Streets Corp., 79 F.(2d) 284 (C.C.A.3); and see to the same effect subdivision (a) of section 77B (11 U.S.C.A. § 207 (a). The federal courts administer the general law of equity, as accepted in England, and as generally administered in this country. James v. Gray, 131 F. 401, 1 L.R.A.(N.S.) 321 (C.C.A.1).

It is in our capacity as a court of equity that we are to adjudicate the rights of the parties before us. A transit situation exists in this city today, so far as stock investments are concerned, which has aroused the concern and discontent of the investing public, and has even incurred the condemnation of some of our courts. If the underliers are the present owners of the entire transit system under the original lease of 1902 and the later agreements of 1908 and 1912, they are justly entitled to the heavy

payments which they have been receiving from the P. R. T., and all censure of them should cease. We are not unmindful of the proofs in the record that at the time of the execution and ratification of the original lease of 1902 a majority of five out of eight of the directors of the P. R. T., present and voting, were at the same time interlocking directors and stockholders of the Union Traction Company. We are not unmindful, either, that if the P. R. T.'s claim to ownership in the larger part of the transit system be but an unfounded pretense, then certainly the people at large including the employees of the P. R. T., who, it appears, were encouraged to invest approximately $42,000,-000 of their money in the capital stock of the P. R. T., are woefully and pitiably undone.

It is therefore with a sense of heavy responsibility that we have examined the lengthy original lease of 1902, and the later agreements of 1908 and 1912, to discover, if we could, any expression of the intention of the parties which would cogently and clearly support the contention of the underliers that they are present owners of the entire transit system. As the learned special master says: "The effect of the lease of 1902 and the subsequent agreements, assignments, etc., to vest in the petitioner title to all property installed by way of renewals, replacements and extensions at the cost of the Debtor, is, as the Special Master has heretofore noted, vitally important to the petitioner's contention, for it is upon its contention that all such renewals, replacements and extensions belong to it, that the petitioner stands. If this contention cannot be sustained, then the proof offered by it in support of its claim for use and occupation, cannot be the basis for any allotment, for its proof of the use and occupation value is applicable to that condition only."

As we have said, we are unable to discover any such expression of the intention of the parties in the original lease of 1902, or in the later agreements of 1908 and 1912. On the contrary, the conclusion reached from our study of those instruments, interpreted in the light of the decisions we have cited, the Belt Line Case and the Montello Brick Case, is that the Union Traction Company and its allied underliers have a present ownership, only in so much of the property demised in 1902 as remains extant today.

Accordingly, the contrary finding of the learned special master is not approved and

adopted, and the exceptions to that finding are sustained.

The special master has recommended that the reasonable payment which the court should allow to the Union Traction Company is the sum of $3,500,000. He bases this recommendation upon the contention of the Union Traction Company (which he approves and adopts) that title to the extensions and enlargements vested in that company at the time of the installation of the extensions and enlargements, and remains in the company today. He says:

"If this contention cannot be maintained, then the proof offered by the Company in support of its claim for use and occupation, cannot be the basis for any allotment; for its proof of the use and occupation value, is applicable to this condition only. * * *

"The question of ownership of the renewals, replacements and extensions, installed upon 'all other lines' since 1902 by P. R. T., at its own expense, though under the provisions of the lease, is a vital one. If all this property belongs to Union, it will be entitled to an allowance for use and occupation. · If all of it does not belong, its case is not complete, for its proof of use and occupation value, is based only on a complete ownership."

As we have already said, we hold that the Union Traction Company and its allied underliers have not present ownership, except as to so much of the property demised in 1902 as remains extant today.

By the terms of the 1902 lease, the P. R. T. unqualifiedly covenanted to pay a rental which, for some time back, has amounted to over $7,000,000 annually, upon which they have now paid approximately $226,000,000, but upon which there remains in arrears and unpaid today an amount approximating $13,000,000.

Our Circuit Court of Appeals has ruled that the existing status between the contending parties is that of debtor and creditor. In consideration of that status, this court, bearing in mind that there are no other creditors, has, during the 77B proceedings before us, allowed payment of $600,000 and $700,000, or a total of $1,300,000, to be made to the Union Traction Company on behalf of itself and its allied underliers.

We do not feel authorized to sanction any further payments at the present time on the basis recommended.

Obviously, there are outstanding equities between these contending parties, which, as they deeply affect the interests of their respective stockholders as well as the public, should receive well-considered attention and adjustments at an early day.

We take the case before us as we find it. From the careful analysis which we have made of the 1902 lease (which, it is admitted, forms the basis of the claim for further payments requested at this time), we find no such present ownership in the one contending party, as would authorize us, summarily and in advance of the reorganization program now in this court, to make the payment requested.

The situation is one peculiarly calling for reconciliation and readjustment in the plan of reorganization. Good faith, within the meaning of the statute, requires the prompt submission of a plan. The court wishes to impress this most emphatically on the parties. No question of city ownership or city acquisition is to be used to delay the proceedings. That is a matter for the city and the other parties to the case to negotiate in the future if they desire. Opportunity was given for negotiation along this line some months ago. This was given at the request of all the parties to the case. Those negotiations have been brought to naught, notwithstanding the good intentions of the parties, and that phase of the question must not in future delay or retard the orderly procedure of reorganization under 77B in this court. We have above referred to existing equities between the parties. It appears from the record that the equities of the underliers would approximate $60,000,000 and that the equities of the P. R. T. would approximate $42,000,000. The city of Philadelphia has appropriated many millions for its city-built high-speed lines. Let these facts, together with the admitted arrearages of rent in the approximate sum of $13,000,000, be taken into serious consideration in the formation of any plan that may be forthcoming. To the wise and fair and equitable provisions of that plan we now commit the petition which is before us.

Meantime, the recommendation of the learned special master for the present payment of $3,500,000 to the petitioner is not approved and adopted, the exceptions filed thereto are sustained, and the prayer of the petitioner filed March 5, 1936 is denied.

Counsel may present an appropriate order.